1  Deborah A. Sivas (CA Bar No. 135446)
   Matthew J. Sanders (CA Bar No. 222757)
2  Stephanie L. Safdi (CA Bar No. 310517)
   Rica V. Garcia (CA Bar No. 320758)
3  ENVIRONMENTAL LAW CLINIC
   Mills Legal Clinic at Stanford Law School
4  Crown Quadrangle, 559 Nathan Abbott Way
   Stanford, California 94305-8610
5  Telephone:  (650) 725.8571
   Facsimile:  (650) 723.4426
6
7  Ashley E. Werner (CA Bar No. 282217)
   Phoebe S. Seaton (CA Bar No. 238273)
   LEADERSHIP COUNSEL FOR
8  JUSTICE AND ACCOUNTABILITY
   2210 San Joaquin Street
9  Fresno, California 93721
   Telephone:  (559) 369.2780
10
11 Attorneys for Friends of Calwa, Inc. and Fresno
   Building Healthy Communities

12

13              **UNITED STATES DISTRICT COURT**

14             **EASTERN DISTRICT OF CALIFORNIA**

15                     **(Fresno Division)**

16 | FRIENDS OF CALWA, INC. and FRESNO | Case No. |
   | BUILDING HEALTHY COMMUNITIES, | |

17 |                                   |          |
   |          Plaintiffs and Petitioners, | **VERIFIED PETITION FOR WRIT OF** |
18 |                                   | **MANDATE AND COMPLAINT FOR** |
   |          v.                       | **DECLARATORY AND INJUNCTIVE** |
19 |                                   | **RELIEF** |
   | CALIFORNIA DEPARTMENT OF          | |
20 | TRANSPORTATION, FEDERAL           | National Environmental Policy Act, 42 U.S.C. |
   | HIGHWAY ADMINISTRATION, and DOES  | §§ 4321 et seq.; Administrative Procedure Act, |
21 | 1-50 inclusive,                   | 5 U.S.C. §§ 701 et seq.; California |
   |                                   | Environmental Quality Act, Cal. Pub. Res. |
22 |          Defendants and Respondents, | Code. §§ 21000 et seq.; Cal. Code Civ. Proc. |
   |                                   | §§ 1085 and 1094.5 |
23 | DOES 51-100 inclusive,            | |
   |                                   | |
24 |          Real Parties in Interest. | |

25

26

27

28

# I.    INTRODUCTION

1.    This action challenges a project by Defendants and Respondents California Department of Transportation ("Caltrans") and Federal Highway Administration ("FHWA") (collectively, "Defendants") to reconstruct and expand two interchanges on North Avenue and American Avenue connecting California State Route 99 to local roadways in South Fresno to increase capacity for heavy-duty truck traffic and support expansive industrial buildout in nearby low-income communities of color.

2.    For over fifty years, State Route 99 has cut a line through South Fresno, dividing communities from each other and cutting them off from the commercial and economic resources of downtown, while carrying an expanding flow of truck traffic and attendant pollution into local neighborhoods.

3.    Neighborhoods and communities surrounding the interchanges – including the historic unincorporated communities of Calwa and Malaga to the east and Daleville, Britten Avenue, and West Fresno communities to the west – are among the most polluted in the state from particulate matter and other traffic-related emissions, as well as from industrial facilities fed by the trucks that flow from State Route 99.  They are also among the most socially vulnerable, bearing the marks of decades of racial segregation and discrimination in zoning and financial services.  The neighborhoods most impacted by this project also have a high degree of linguistic isolation and significantly higher poverty rates relative to surrounding areas.  Unlike whiter and more affluent neighborhoods in the northern parts of the City, South Fresno communities have been zoned for decades for industrial land uses.  These communities have inherited and continue to suffer from the legacy of environmental racism.

4.    For years, residents of Calwa, Malaga, and other nearby communities, as well as organizations that advocate for their interests – including Plaintiffs and Petitioners Friends of Calwa and Fresno Building Healthy Communities (collectively "Plaintiffs") – have fought the continued industrialization of their communities by opposing the siting of new industrial developments, investing in parks and other green spaces, advocating for buffers from polluting sources, and endeavoring to bring assets into the area compatible with a thriving residential community.

5.      Over the last decade, the State of California has adopted legislation and other directives requiring state and local agencies to reduce pollution exposures, reverse industrialization trends, and promote environmental justice in these overburdened communities.  Among such efforts, the California Air Resources Board designated South Central Fresno as a priority community under California Assembly Bill 617, requiring air monitoring and development and implementation of a Community Emission Reduction Program to reduce air pollution from traffic and industry.  Likewise, the Attorney General's Office has warned the County that its land use policies targeting South Fresno for industrial development likely violate state civil rights law and environmental justice mandates.

6.      Defendants' South Fresno State Route 99 Corridor Project (the "Project") conflicts with these policies and practices to reduce air pollution and industrial burdens in South Fresno.  The Project would increase the capacity of traffic – particularly heavy-duty trucks – to flow between the highway and local South Fresno roadways.  The existing interchanges and adjacent local roads have deteriorated over time due to the concentration of industry in the area.  Instead of remedying existing problems, Defendants proposed and approved a Project that would facilitate increased industrial buildout and related heavy-duty truck traffic, exacerbating pollution impacts in surrounding communities and locking in a vision of expanding industrialization in the area.

7.      As a joint project between Caltrans and the FHWA, the Project is subject to the protections of the National Environmental Protection Act, 42 U.S.C. sections 4321 et seq. ("NEPA"), and the California Environmental Quality Act, California Public Resources Code sections 21000 et seq. ("CEQA").  These laws require Defendants to carefully analyze and disclose potential environmental impacts of the Project, including impacts on air quality, traffic, and environmental justice, as well as conflicts with air quality plans and land use policies.  And these laws require Defendants to consider less harmful alternatives and to adopt feasible and enforceable mitigation measures to reduce adverse impacts to insignificance.

8.      Defendants' review of the Project fell significantly short.  Defendants prepared an Environmental Impact Report ("EIR") under CEQA that, among other things, failed to acknowledge the existence of *any* impacted communities or sensitive receptors, failed to consider conflicts with air quality and land use plans and policies, failed to analyze the capacity-increasing Project's impacts on

VERIFIED PETITION AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO.

vehicle miles traveled, and failed to consider cumulative impacts of the Project together with similar and coordinated Caltrans' projects up and down the State Route 99 corridor.  Defendants also refused to prepare a detailed Environmental Impact Study for the Project under NEPA, instead relying on the flawed EIR to find that the Project is not likely to have a significant adverse impact on the human environment, despite Defendants' conclusion that greenhouse gas impacts would be significant and unavoidable.  And Defendants failed to make underlying studies and reports readily accessible to the public, including in Spanish, the language spoken by a majority of affected residents.

9.    The numerous inadequacies in the environmental analysis mean that decisionmakers and the public have been left in the dark about impacts of the Project, including its contribution to already disproportionate pollution burdens borne by South Fresno's communities of color and its conflict with laws and policies designed to reverse these trends.  The Court should issue a declaration finding that Defendants' approvals of the Project violate federal and state environmental laws, and it should set aside approvals of the Project and certification of the legally deficient environmental documents on which they rely.

## II.    JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. section 1331, as Plaintiffs assert federal claims under NEPA, and pursuant to 28 U.S.C. section 1346, as Plaintiffs assert claims against the United States as a Defendant.  This Court also has subject matter jurisdiction under 23 U.S.C. sections 327(c)(3)(B) and 327(d) and the May 27, 2022 Memorandum of Understanding between Caltrans and the FHWA, which together provide for exclusive jurisdiction in the federal district court for the compliance, discharge, and enforcement of any responsibilities assigned by the FHWA and assumed by Caltrans, including compliance with NEPA.  The State of California has consented to federal jurisdiction in these matters and has waived any claim of sovereign immunity pursuant to California Streets and Highways Code section 820.1.

11.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. section 1367(a) over Plaintiffs' state law claims under CEQA, because these state law claims arise out of the same nucleus of operative facts as the federal law claims and are so related to the federal law claims that they form part of the same case or controversy.  Such state law claims are brought pursuant to Public Resources

Code sections 21168 (or, in the alternative, pursuant to Public Resources Code section 21168.5) and 21168.9, as well as California Code of Civil Procedure sections 1094.5 (or, in the alternative, 1085).

12.     Declaratory and injunctive relief is sought and authorized under 28 U.S.C. sections 2201 and 2202.

13.     Plaintiffs have performed any and all conditions precedent to filing this action and have exhausted all administrative remedies available to them to the extent required by law, and the violations of law claimed below are ripe for judicial review.

14.     Plaintiffs have served the Attorney General of the State of California with a copy of the petition and complaint along with a notice of filing in compliance with California Public Resources Code section 21167.7 and California Code of Civil Procedure section 388.  The Notice and Proof of Service are provided as Exhibit A.

15.     Plaintiffs have provided written notice to Caltrans of their intent to file this petition and complaint asserting claims for violations under CEQA and have provided the Notice and Proof of Service as Exhibit B as required by California Public Resources Code section 21167.5.

16.     Plaintiffs have complied with the requirements of California Public Resources Code section 21167.6 by concurrently filing a notice of Plaintiffs' election to prepare the record of administrative proceedings relating to the CEQA claims in this action.

17.     Venue lies in this District, pursuant to 28 U.S.C. section 1391(e), because the events giving rise to this lawsuit occur in this District and because Caltrans, a Respondent and Defendant in the action, resides within this District.

18.     A substantial part of one of the events or omissions which give rise to the claims herein occurred in Fresno County; the Project is located in Fresno County and administered by Caltrans District Six, which includes and has offices in Fresno County; Plaintiffs' offices and staff are located in Fresno County; and many of the adverse impacts of Defendants' violations of the law occurred or will occur in Fresno County.  Therefore, assignment to the Fresno Division of this Court is proper under U.S. District Court for the Eastern District of California, Civil Local Rule 120(d).

19.     Plaintiffs do not have a plain, speedy, or adequate remedy at law and will be irreparably harmed by Defendants' actions and inactions challenged herein.

VERIFIED PETITION AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO.

20.    An actual justiciable controversy exists between the parties hereto.

### III.    PARTIES

21.    Plaintiff and Petitioner FRIENDS OF CALWA, INC. is a California non-profit organization based in Fresno County in the community of Calwa.  Friends of Calwa was formed in 2009 by a group of Calwa neighbors who came together with the vision that all people, regardless of income level, cultural background, or political persuasion are entitled to live in neighborhoods that nurture their development.  Friends of Calwa brings resources and people together to foster a healthy and thriving Calwa, where all people have access to quality education, good jobs, healthy food, public transportation, housing, recreation and parks, retail, meaningful civic engagement, and the opportunity to enjoy artistic, spiritual, and cultural amenities.  In service of this mission, Friends of Calwa works to promote environmental health and justice in Calwa, including by advocating before local, state, and federal agencies to protect the health and environment of the local community from harmful industrial development and traffic, and from consequent toxic pollution.

22.    Friends of Calwa, and Calwa residents on whose behalf the organization advocates, are directly adversely impacted by the Project.  Friends of Calwa's mission to ensure that residents enjoy equal access to environmental benefits and protection from health and environmental burdens regardless of race, color, national origin, or income is frustrated by Defendants' support for and approval of the Project.  Friends of Calwa has been and will be required to divert resources from other organizationally important programs and services to challenge Defendants' actions and the environmental harms that will flow from them.  Friends of Calwa has also been required to invest staff time and other resources to ensure that residents of Calwa and other area residents have opportunities to provide input to Caltrans regarding the Project.

23.    Plaintiff and Petitioner FRESNO BUILDING HEALTHY COMMUNITIES ("Fresno BHC") is a California nonprofit organization based in the City of Fresno.  Fresno BHC's mission is to foster thriving communities where all children and families can live healthy, safe, and productive lives.  Fresno BHC is led by and works for the rights of people of color, as well as for the benefit of all Fresno County residents.  Fresno BHC brings attention and resources to Fresno communities and neighborhoods that need it most, including Calwa, Malaga, and nearby areas.  In service of this

mission, Fresno BHC endeavors to build community members' leadership and further community priorities relating to six focus areas: (1) advancing health equity across Fresno; (2) ensuring access to safe, affordable housing for every community member; (3) uplifting neighborhoods through community-engaged economic development; (4) advocating for responsible land use practices which support the development of parks and sustainable business, rather than polluting facilities; (5) improving access to outdoor spaces; and (6) advocating for quality transportation options which result in safer streets, cleaner air, and better public transit.  One of Fresno BHC's current projects is managing the state-funded renovation of the 70 year-old Calwa Park.

24.    Fresno BHC and the communities on whose behalf it advocates are directly impacted by the Project.  Fresno BHC's mission to support a healthy and thriving South Central Fresno is frustrated by Defendants' support for and approval of the Project.  In addition, Fresno BHC has been and will be required to divert staff time and other resources away from other important projects and services, such as its efforts to support local training and leadership and to build environmental and community assets in South Central Fresno, to oppose Defendants' approvals of the Project and counteract the adverse environmental and health impacts that will result from the Project.

25.    Defendant FEDERAL HIGHWAY ADMINISTRATION ("FHWA") is a federal agency within the U.S. Department of Transportation that supports state and local governments in the design, construction, and maintenance of the Nation's highway system, including by providing financial and technical assistance.  FHWA is responsible for ensuring that federal highway projects, including the Project, comply with relevant state and federal laws.  The Project is a joint project of FHWA and Caltrans.  Pursuant to 28 U.S.C. section 327(b) and the Memorandum of Understanding between FHWA and Caltrans dated May 27, 2022, FHWA assigned responsibilities under NEPA for transportation projects in California to Caltrans.  This Project is subject to NEPA assignment. Because the Project is in an area designated in non-attainment for ozone and fine particulate matter, FHWA is also responsible under section 176(c) of the Clean Air Act, 42 U.S.C. § 7506, for ensuring that the Project conforms with the applicable State Implementation Plan to obtain National Ambient Air Quality Standards; FHWA issued a conformity determination for the Project on October 3, 2022.

26.    Defendant CALIFORNIA DEPARTMENT OF TRANSPORTATION

VERIFIED PETITION AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO.

("CALTRANS") is a California public agency responsible for managing California's highway and freeway system. Caltrans is the lead agency responsible for environmental review of the Project under CEQA and, as assigned by the FHWA, under NEPA. Caltrans is listed as the Project Applicant on the February 6, 2023 Notice of Determination. Plaintiffs are informed and believe, and on that basis allege, that Caltrans is undertaking the Project as part of its broader vision, goals, and policies to expand capacity of State Route 99 to support increased movement of goods.

27. Plaintiffs do not know the true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants and Respondents DOES 1-50 and Real Parties in Interest DOES 50-100, inclusive, and therefore sue said Defendants, Respondents, and Real Parties in Interest under fictitious names. Plaintiffs will amend this Complaint to show their true names and capacities when the same have been ascertained.

## IV.   LEGAL BACKGROUND

### A.   The National Environmental Policy Act

28. Congress enacted NEPA "to promote efforts which will prevent or eliminate damage to the environment" and to "stimulate [human] health and welfare." 42 U.S.C. § 4321. Recognizing the "profound influences" of "industrial expansion" and other intensive human activity on the natural environment and on human health and welfare, NEPA requires the federal government to use all practical means to improve and coordinate federal plans, functions, programs, and resources to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings." 42 U.S.C. § 4331.

29. NEPA is intended to ensure that all federal agencies consider the environmental impacts of their actions in their decision-making processes, thereby making environmental protection part of the mandate of every federal agency. 40 C.F.R. § 1500.1(a). NEPA fulfills this purpose by requiring that agencies take a "hard look" at environmental impacts of federal action before the action occurs and by ensuring that "relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-50 (1989). NEPA's purpose is not to generate paperwork, but to provide for informed decision-making and excellent agency action. 42

7

1    U.S.C. § 1500.1(a).

2         30.    NEPA and the regulations promulgated thereunder by the Council on Environmental

3    Quality require preparation of a detailed statement, referred to as an Environmental Impact Statement

4    ("EIS"), for all "major Federal actions significantly affecting the quality of the human environment."

5    40 C.F.R. § 1502.3; 42 U.S.C. § 4332(c).  The EIS must provide a full and fair discussion of

6    significant environmental impacts and inform decisionmakers and the public of reasonable

7    alternatives that would avoid or minimize adverse impacts or enhance the quality of the human

8    environment.  42 U.S.C. § 4332(c); 40 C.F.R. § 1502.1.

9         31.    An agency's NEPA review must consider direct effects of the agency action, as well

10   as "[i]ndirect effects, which are caused by the action and are later in time or farther removed in

11   distance, but are still reasonably foreseeable."  40 C.F.R. § 1508.1(g)(1)-(2).  And it must consider

12   "[c]umulative effects, which are effects on the environment that result from the incremental effects of

13   the action when added to the effects of other past, present, and reasonably foreseeable actions"

14   regardless of what agency or person undertakes those actions.  40 C.F.R. § 1508.1(g)(3).  Cumulative

15   effects may "result from individually minor but collectively significant actions taking place over a

16   period of time."  *Id*.  The requirement that agencies consider the full range of cumulative effects

17   prevents agencies from "impermissibly subject[ing] the decision-making process contemplated by

18   NEPA to the tyranny of small decisions" – that is, from "dividing a project into multiple actions, each

19   of which individually has an insignificant environmental impact, but which collectively have a

20   substantial impact."  *Kern v. BLM*, 284 F.3d 1062, 1078 (9th Cir. 2002) (citations omitted).

21        32.    In evaluating the significance of agency action, the agency must consider "both the

22   context and the intensity of the possible effects" and base its decision on consideration of all relevant

23   factors.  *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 869 (9th Cir. 2020).  Effects that must be considered

24   include ecological, aesthetic, historic, cultural, economic, social, and health effects, whether direct,

25   indirect, or cumulative.  40 C.F.R. § 1508.1(g)(4).

26        33.    To determine whether a proposed action significantly affects the environment such

27   that an EIS is required, the lead agency may initially prepare an Environmental Assessment ("EA").

28   40 C.F.R. §§ 1501.5(a), 1501.5(c)(1).  An EA must provide sufficient evidence and analysis of the

8

proposed action's direct, indirect, and cumulative impacts to determine whether the lead agency must prepare an EIS.

34.    The lead agency may issue a Finding of No Significant Impact ("FONSI") only if the EA supports the finding that the proposed action will not have a significant effect on the environment.  40 C.F.R. § 1501.6(a).  If at any point the agency determines that the action is likely to have a significant impact on the environment, then the agency must prepare an EIS before proceeding with the action.  23 C.F.R. § 771.119(i); *see Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864 (9th Cir. 2005) (EIS must be prepared where "substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor").

35.    Courts will set aside a FONSI and require preparation of an EIS if the FONSI is based on conclusory or perfunctory assertions that do not reflect adequate consideration of relevant factors. *Ocean Advocates*, 402 F.3d at 864, 870.

36.    Claimed violations of NEPA are reviewed under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA").  The APA confers a right of judicial review on any person that is adversely affected by agency action.  5 U.S.C. § 702.  Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence" in the record, as well as those found to be "without observance of procedure required by law."  5 U.S.C. § 706(2).

**B.    California Environmental Quality Act**

37.    CEQA is California's comprehensive statute intended to provide for the "long-term protection of the environment, consistent with the provision of a decent home and suitable living environment for every Californian."  Cal. Pub. Res. Code § 21001(d).  CEQA makes it state policy to "[d]evelop and maintain a high-quality environment now and in the future, and take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state."  *Id.* § 21001(a).

38.    CEQA mandates environmental review of all state and local agency projects in California to inform decisionmakers and the public about potential significant environmental effects and to identify ways to avoid or significantly reduce those impacts.  CEQA Guidelines (14 Cal. Code

9

1   Regs.) § 15002.

2       39.    Under CEQA, all state lead agencies must prepare and certify completion of an

3   Environmental Impact Report ("EIR") for any project they propose to carry out or approve that may

4   have significant effects on the environment.  Cal. Pub. Res. Code § 21100(a).  As the "heart" of

5   CEQA, the EIR is "an environmental 'alarm bell' whose purpose it is to alert the public and its

6   responsible officials to environmental changes before they have reached ecological points of no

7   return."  *Laurel Heights Improvement Assn. v. Regents of Univ. of Cal.*, 47 Cal.3d 376, 392 (1988)

8   (citation omitted).

9       40.    An EIR must identify and describe the project's potential direct and indirect

10  significant effects on the environment, as well the project's cumulative impacts when viewed in

11  connection with the effects of past, present, and probable future projects.  CEQA Guidelines

12  §§ 15126.2(a), 15065(a)(3), 15130(a).  In doing so, the EIR must describe and disclose the "whole of

13  [the] action," CEQA Guidelines § 15378(a), thereby ensuring that "environmental considerations do

14  not become submerged by chopping a large project into many little ones – each with a minimal

15  potential impact on the environment – which cumulatively may have disastrous consequences."

16  *Laurel Heights Improvement Assn.*, 47 Cal.3d at 396 (citation omitted).

17      41.    Environmental effects that the agency must consider include, but are not limited to,

18  adverse impacts on aesthetics, noise, housing, land use, traffic, pedestrian and bicyclist facilities,

19  climate change, and air quality.  CEQA Guidelines, App. G.  Analysis of air quality impacts must

20  consider the potential for a project to conflict with or obstruct implementation of an applicable air

21  quality plan and to expose sensitive receptors to substantial pollution concentrations.  *Id.* App. G,

22  § III.  Further, an agency must make a reasonable effort to substantively connect a project's air

23  quality impacts to likely health consequences.  *Sierra Club v. County of Fresno*, 6 Cal.5th 502, 510

24  (2018); *see* CEQA Guidelines § 15126.2(a).

25      42.    CEQA makes a finding of significance mandatory when the project will "have

26  environmental effects which will cause substantial adverse effects on human beings, either directly or

27  indirectly."  CEQA Guidelines, App. G, § XXI.  The EIR must also set forth project alternatives and

28  enforceable mitigation measures to avoid or minimize environmental damage.  *Id.* § 15002(a)(2)-(3).

10

43.     The EIR must include an accurate description of the physical and environmental conditions in the vicinity of the project, which serves as the baseline against which the lead agency determines whether an impact is significant.  *Id.* § 15125(a).  This baseline must ordinarily reflect conditions "as they exist at the time the [CEQA] notice of preparation is published."  *Id.* § 15125(a)(1).  Without an adequate baseline description, "analysis of impacts, mitigation measures and project alternatives becomes impossible."  *Save our Peninsula Comm. v. Monterey Cnty. Bd. of Supervisors*, 87 Cal.App.4th 99, 124 (2001) (citation omitted).

44.     An accurate description of the environmental setting is also critical because the significance of an activity may vary with the setting.  CEQA Guidelines § 15064(b)(1).

45.     The lead agency must provide an adequate opportunity for public review and comment on a draft EIR and must thoroughly evaluate all comments received, offering a good faith, reasoned analysis in a written response.  *Id.* §§ 15087, 15088.  In particular, the lead agency's response to comments must address in detail major environmental issues raised when the lead agency's position differs from recommendations and objections made in public comments.  *Id*. § 15088(c).

46.     An agency may only proceed with a project that will have significant, unmitigated effects on the environment "unless the measures necessary to mitigate those effects are truly infeasible" and the agency determines that the project's specific benefits outweigh these effects.  *City of San Diego v. Bd. of Trustees of Cal. State Univ.*, 61 Cal.4th 945, 967 (2015).  When the lead agency approves a project which will result in significant and unavoidable effects, the agency must provide a detailed statement of reasons, supported by substantial evidence, to support its approval. CEQA Guidelines § 15093(b).

## V.     FACTUAL BACKGROUND

**A.     Community and Environmental Setting**

### Communities within Vicinity of Project Site

47.     The Project is located at the southern edge of the City of Fresno, in close proximity to multiple communities that are collectively home to thousands of residents.

48.     Two historic South  Fresno unincorporated communities – Calwa and Malaga – lie within roughly a mile of the Project, as depicted on the Project map below: Calwa just north of the

11

Project's North Avenue interchange, and Malaga directly between the Project's North Avenue interchange and its southern American Avenue interchange. Calwa and Malaga are located in census tracts home to nearly 8,500 people in total.



Source: Caltrans, South Fresno State Route 99 Corridor Project Draft Environmental Impact Report, Figure 1-2.

49.    Both Calwa and Malaga are designated as "disadvantaged unincorporated communities" under Senate Bill 244, meaning that they have "an annual median household income [] that is less than 80 percent of the statewide annual median household income." Cal. Water Code § 79505.5(a). Other disadvantaged unincorporated communities within the Project vicinity include the communities of Shady Lakes Mobile Home Park (0.6 miles from the Project), Daleville (approximately one mile from the Project), Flamingo Mobile Home Lodge (1.4 miles from the Project), and Britten Avenue (1.6 miles from the Project). Additional low-income neighborhoods within the City are within 1.5 miles of the Project, including neighborhoods in Southwest and Southeast Fresno and others in the triangle between State Route 99 and 41 and American Avenue.

50.    Calwa was established in 1885, the same year the City of Fresno was incorporated.

VERIFIED PETITION AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO.

Today, Calwa is home to a vibrant mixed-use commercial and residential district whose community assets include Calwa Elementary School, a beauty salon, a candy store, a taqueria, a barbershop, and a bank, as well as blocks of single-family residential homes and multi-family apartments. Calwa is also home to several long-established places of worship, including the St. Anthony Mary Claret Church, the Lao Evangelical Church, and the Calwa United Methodist Church. The Calwa Park, supported by the Calwa Recreation and Parks district, recently received funding for a playground, picnic area, walking loop, and a renovation project for the swimming pool.

51.    Malaga was established in 1883. Today, the community's amenities include Cristo Rey Catholic Church, the Malaga Community Park and Recreation Center, and Malaga Elementary School, as well as blocks of single-family homes and multi-family apartments.

52.    An array of additional community assets and sensitive land uses are located within 1.5 miles of the Project, including Gurdawara Nanaksar Sahib, a Sikh Temple (0.6 miles from the Project), Orange Elementary School (0.85 miles from the Project), and West Fresno Elementary School and West Fresno Middle School (1.4 miles from the Project). In addition, a 1,400-bed juvenile detention facility lies just 300 yards from the Project's American Avenue interchange site.

## History of Segregation and Discriminatory Land Use Practices

53.    The Project's proximity to these communities is no accident: Fresno County has a long history of government-sponsored segregation and discriminatory land use practices that have concentrated highways and industrial development in these areas, produced outsized environmental and health burdens, limited housing options, and undermined access to opportunity.

54.    Fresno County's history of segregation goes back to at least the 1870s. During a town meeting in 1873, the City of Fresno's white residents agreed not to rent, sell, or lease any land east of the railroad tracks to Chinese immigrants, setting in motion a history of exclusion, the effects of which persist today. Local police enforced these color lines, criminalizing residents of color who dared to transgress them.

55.    Over the next 25 years, the population of Fresno grew as the area attracted immigrants from China, Mexico, Japan, Armenia, and Italy – many of whom were forced to live in segregated parts of southwestern Fresno. In 1918, the City of Fresno's first general plan furthered residential

VERIFIED PETITION AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO.

segregation by designating the southern parts of the city for multi-family housing targeted toward lower-income households and for polluting land uses, leading to the concentration of industrial development in the area's poorest neighborhoods and in communities of color. Even after the Supreme Court declared racially restrictive zoning unconstitutional, the Fresno County Recorder's Office recorded thousands of racially restrictive covenants prohibiting the sale, lease, or occupation of property in Fresno's "white" neighborhoods to immigrants and people of color.

56. In the 1930s, "redlining maps" created by the quasi-governmental Homeowners' Loan Corporation ("HOLC") categorized neighborhood desirability for financial lending based on "risk factors" including neighborhoods' racial composition and polluting land uses. Fresno was one of eight cities in California subject to a HOLC redlining map. This 1936 HOLC map marked areas in southwest Fresno as red ("Hazardous") and yellow ("Definitely Declining"), denoting these census tracts as the riskiest for financial investment.

57. Like racially restrictive covenants, the HOLC maps both recorded and furthered formal segregation practices. Fresno's HOLC map, for instance, described a red-colored tract at the southwestern corner of the City as "hazardous" on account of having "occupants" who "are a mixture of races – viz, Mexicans, uneducated Germans, Russians, and Italians" and being "zoned for business," while it described a tract to the north as "still desirable" due to being "generally protected by racial deed restrictions."

58. In the 1950s, construction of State Route 99 further cemented this decades-long history of government-sponsored segregation, creating a physical barrier cutting off lower-income communities of color on the southwest side of Fresno from the public and private resources of downtown. The establishment of the highway destroyed more than 20 blocks of existing housing; according to news reports, a former member of Fresno County's Board of Supervisors would refer to the highway as "Fresno's Berlin Wall."

59. Caltrans acknowledged in a 2020 Equity Statement that communities of color and under-served communities have experienced fewer benefits and a greater share of negative impacts associated with the state's transportation system, and that its own highway projects "quite literally put up barriers, divided communities, and amplified racial inequities, particularly in [] Black and Brown

14

1   neighborhoods."

2      60.    The City of Fresno continued to expand upon its industrial zoning patterns in South

3   and West Fresno in the ensuing decades.  The 1977 Edison Community Plan, which covered

4   significant portions of West Fresno, stated: "Living close to industrial activity is a major fact of life"

5   and "[i]t is not possible to enter this area from any other portion of the City without passing through a

6   major industrial concentration."  The 1978 Roosevelt Community Plan planned for substantial

7   industrial development along the City's southern fringes, including around Calwa.  The 1992

8   Roosevelt Community Plan continued to promote industrial development in these neighborhoods,

9   encompassing around one-third of the City's industrial lands inventory.

10      **Social Vulnerabilities and Pollution Burdens Facing Project-Adjacent Communities**

11      61.    The communities of Calwa and Malaga – which lie just outside of historically redlined

12   census tracts and alongside State Route 99 – as well as other communities near the Project site

13   continue to bear the marks of this long lineage of discriminatory land use, housing, and transportation

14   policies and practices.  According to the California Environmental Protection Agency ("CalEPA"),

15   neighborhoods designated with lower HOLC scores are "much more likely to have higher levels of

16   pollution burden or vulnerability" today.  This is clear in South Fresno, where many neighborhoods

17   rank among the most impacted by pollution burdens in the state.

18      62.    Calwa and Malaga, for instance, are disproportionately low-income communities of

19   color relative to Fresno County and to the state as a whole.  These communities also have

20   disproportionately high proportions of residents who speak a language other than English and are

21   comprised of a greater proportion of children and families with children compared to Fresno County

22   and the state as a whole.

23      63.    Eighty-six percent of Calwa residents identify as Hispanic or Latino relative to 55

24   percent in Fresno County and 40.2 percent in the state, and 92 percent identify as non-white relative

25   to 72.8 percent in the County and 64.8 percent in the state.  Forty percent of homes in Calwa house

26   children, and 85 percent house family units.  Calwa is also in the 99th percentile of census tracts in

27   the state for number of children under the age of five.  Calwa residents are more linguistically

28   isolated than residents living in 86 percent of California census tracts.  Thirty-seven percent of

residents earn incomes that fall below the poverty line – nearly double the rate in the County as a whole.  And the median Calwa household income is just over $50,000, whereas the median household income for the County and state as a whole are $61,000 and $84,000, respectively.

64.     Similarly, 92 percent of Malaga residents identify as Hispanic or Latino and 95 percent as non-white.  The median household income in Malaga is just under $46,000.  The percentage of people in Malaga living below twice the federal poverty level is worse than in 94 percent of census tracts in the state.

65.     Children in Calwa and Malaga face high rates of household poverty.  As of 2020, 84 percent of students at Malaga Elementary School and 96 percent of students at Calwa Elementary School qualified for free or reduced lunch due to the high poverty rates in these communities.

66.     Other neighborhoods in the vicinity of the Project site are also disproportionately comprised of residents who identify as Latino, Black, and/or Asian Pacific Islander, are low-income, and/or speak a language other than English at home.

67.     South Fresno is home to a disproportionate concentration of heavy industrial uses, compared to the City and County as a whole.  Industrial sources in the area range from smaller operations like gasoline dispensing operations and auto body coating operations, to medium-sized operations like chrome plating facilities, to larger operations like a biomass power facility, a gasoline pipeline terminal facility, and others.  Of particular concern for local air quality emission impacts are the Vitro Architectural Glass manufacturing facility just outside of Malaga, the steel product manufacturer Modern Custom Fabrication, Inc. between Calwa and Malaga, and multiple warehouse facilities in the vicinity.

68.     In the last few years, the City of Fresno has approved over five million square feet of warehouse space in South Fresno, near the disadvantaged unincorporated community of Daleville, Orange Center Elementary School, and other sensitive land uses.  The City has also identified around 6,000 acres of land within its sphere of influence in South Fresno for industrial development and called out the need for transportation capital projects to service this industrial growth.

69.     Likewise, in 2021 the Fresno County Board of Supervisors directed County staff to study a nearly 3,000-acre area adjacent to Malaga, currently zoned for largely agricultural use, for

VERIFIED PETITION AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO.

development of the "Fresno County Business and Industrial Campus" and to assess infrastructure needs, including roads and highways, to enable this industrial expansion.  In November 2022, the County of Fresno initiated study of a proposal to rezone 159 acres of existing farmland to heavy industrial use within the area designated for this Campus.  According to a member of the County Board of Supervisors, the Project would directly enable the development of this Campus, which would represent the largest industrial development in the area to date.  The Supervisor acknowledged that the County is "doing the industrial park because it is potentially a fit for this area with these [Caltrans projects] and other improvements" and that "interchange upgrades [are] a help to the industrial park."

70.    The concentrated development and operation of heavy industrial uses and warehouse facilities, and related heavy-duty truck traffic exposes residents of Calwa, Malaga and other nearby neighborhoods to a range of negative health, safety, and environmental impacts.

71.    The influx of thousands of daily truck trips into and adjacent to South Fresno neighborhoods generates diesel emissions, dust, and other unhealthy air emissions which infiltrate residents' homes, degrade outdoor air quality, and result in acute and long-term health impacts. Trucks passing along local roadways also generate significant street noise and groundborne vibrations which residents can hear and feel in their homes; nighttime light pollution which disrupts sleep; safety risks to pedestrians, cyclists, and public transit users; and odors, among other impacts.

72.    These impacts occur against a backdrop of already severe air pollution burdens from transportation emissions.  The EPA has denoted the San Joaquin Valley, where the Project is located, in "serious" non-attainment for $PM_{2.5}$ pollution and "extreme" non-attainment for 8-hour ozone.

73.    Data from mapping tools developed by California's Office of Environmental Health Hazard Assessment (CalEnviroScreen) and by the United States Environmental Protection Agency (EJScreen) demonstrate the excess pollution burden borne by residents of Calwa and Malaga.  Both mapping tools assess communities at the census tract level to identify relative burdens by particular kinds of pollution from multiple sources and those most vulnerable to the effects of that pollution based on socioeconomic factors and underlying health status.  In addition, CalEnviroScreen assigns cumulative impact scores of 1 through 100 for each census tract based on aggregate pollution burdens

and population vulnerabilities of residents.

74.     The mapping tools illustrate the environmental footprint of decades of concentrated development in and around these communities.  For example, within Calwa, CalEnviroScreen identifies 12 cleanup sites – places that are contaminated with hazardous chemicals and require cleanup by the property owner or government – a concentration higher than in 99 percent of census tracts in California.  Across Calwa and Malaga, EJScreen and CalEnviroScreen identify more than 50 facilities regulated under the Resource Recovery and Conservation Act (a federal law governing management of hazardous and solid waste), 16 facilities regulated under the Toxic Substances Control Act, numerous solid waste sites, and one Superfund Site.

75.      These communities also bear the hallmarks of severe pollution impacts from vehicular and heavy-duty truck traffic.  Calwa is more severely impacted by fine particulate matter ($PM_{2.5}$) pollution than 98 percent of census tracts in the state, and Malaga is more impacted than 96 percent of census tracts in the state.  Similarly, the communities are more burdened by ozone – the main ingredient in smog – than 82 percent and 85 precent of California census tracts, respectively. These communities also suffer from rates of asthma worse than 94 percent and 93 percent of census tracts in the state, respectively.

76.     Health outcomes for populations in these communities are worse than in most of the country.  The census tracts containing Calwa and Malaga have populations with life expectancies lower than 80 percent or more census tracts in the United States, according to EJScreen.

77.     According to CalEnviroScreen, the cumulative adverse impacts experienced by the census tracts containing  Calwa,Malaga, and other communities immediately adjacent to the Project are worse than 99 percent of census tracts in the state.  These severe pollution burden scores led CalEPA to designate both Calwa and Malaga as Disadvantaged Communities under California Senate Bill 535.

**B.     The South Fresno State Route 99 Corridor Project and its Environmental Impacts**

78.     Caltrans has recognized that heavy-duty truck traffic flowing from Route 99 onto local roadways in South Fresno is already resulting in cracked and deteriorating pavement, potholes, and hazardous conditions for local residents.

79.    Instead of simply addressing the existing issues, Caltrans proposed to initiate a Project that would increase heavy-duty truck capacity from Route 99 into and around disadvantaged communities and allow for further industrial expansion in the area.

80.    Currently, vehicles traveling along State Route 99 access local roadways around Calwa and Malaga by way of "half interchanges" at North, Cedar, and American Avenues; these half interchanges separate on- and off-ramps, limiting traffic flow between the highway and local roads.

81.    The Project would replace the existing half interchanges with two new and expanded "full" highway interchanges.  Construction of these interchanges will involve development of new ramps and grade separations at the junction of State Route 99 and North Avenue and American Avenue for the purpose of increasing traffic capacity at the crossings and allowing for bidirectional traffic flow at interchanges.  The Project will also involve construction of a new four-lane bridge structure crossing over State Route 99.  The Project EIR/EA states that the interchange expansion is needed to increase capacity for heavy-duty truck traffic and other vehicles entering and exiting State Route 99 from local roadways.

82.    Caltrans considered just two build alternatives for each interchange, which differed only in their configuration (for instance, a "spread diamond" versus "partial cloverleaf" configuration).  Caltrans did not consider alternatives for the Project that would remediate the current infrastructure without increasing traffic capacity.

83.    According to Caltrans, the Project is part of an "ultimate route concept" for State Route 99 that would expand the highway from six to eight lanes – a 33 percent increase of road capacity.

84.    According to the Project EIR/EA, the new interchanges are intended to "serve as main points of access for the existing and developing industrial and commercial businesses" in the South Fresno area.  This Project is one of dozens of Caltrans projects planned and ongoing in Caltrans District Six to expand traffic flow along State Route 99.  As stated in Caltrans' State Route 99 Business Plan, the purpose of these interchange projects is to accommodate expanding industrial development and goods movement along State Route 99.

85.    The EIR/EA identifies that the Project would increase annual average daily traffic

19

1   volumes at the American Avenue interchange by thousands of vehicles by 2046.

2       86.   The EIR/EA's air quality report identifies that each Project alternative would increase

3   vehicle miles traveled "because the additional capacity of the interchanges increases the efficiency of

4   the interchanges and allows more direct access to local areas along [State Route] 99."

5       87.   As a result of these changes, the Project would adversely affect air quality in the

6   region by increasing particulate matter pollution.  In particular, the Project would increase the total

7   emissions of $PM_{10}$ (inhalable particles with diameters 10 micrometers or smaller) at the American

8   Avenue Interchange by 65 percent in 2026 and by nearly 842 percent by 2046 (from 0.024

9   pounds/day at baseline to 0.23 pounds per day in 2046).  $PM_{10}$ particles contain microscopic solids or

10   liquid droplets that are small enough to be inhaled, causing serious health problems.

11      88.   The EIR/EA also identifies a 50 percent increase in $PM_{2.5}$ pollution at American

12   Avenue by 2026.  $PM_{2.5}$ particles are less than 2.5 micrometers in diameter and pose a significant

13   health risk to humans because of their ability to penetrate the lungs and enter the bloodstream.

14   Children, the elderly, and people suffering from heart or lung disease, asthma, or chronic illness are

15   particularly sensitive to the effects of $PM_{2.5}$ exposure.

16      89.   Based on Caltrans' proposed construction schedule, Project construction is expected to

17   last for almost four years, from January 2025 through December 2028 (18 or more months at each of

18   the two interchange locations).  The EIR/EA acknowledges that Project construction would cause

19   short-term degradation of air quality due to release of particulate emissions, including carbon

20   monoxide, nitrogen oxides, and volatile organic compounds, $PM_{2.5}$, $PM_{10}$, and Toxic Air

21   Contaminants.

22      90.   The EIR/EA further identifies a significant increase in the emissions of carbon

23   dioxide, a greenhouse gas, due to population growth and commercial and industrial development

24   attributable to the Project.  By 2046, carbon dioxide emissions would increase by 3,414 tons per year

25   at the American Avenue interchange and by 4,281 tons per year at the North Avenue interchange.

26      91.   Plaintiffs are informed and believe, and on that basis allege, that increased traffic

27   capacity, induced truck and car traffic, increased vehicle miles traveled, induced industrial

28   development, related light, glare, aesthetic, air quality, and public health impacts from the Project

20

1    would be significantly greater than identified in the EIR/EA.

2        92.    Plaintiffs are informed and believe, and on that basis allege, that increased traffic

3    capacity and induced truck and car traffic associated with the Project would result in significant noise

4    and groundborne vibrational impacts, which would affect nearby residential neighborhoods and

5    communities and worsen already significant noise pollution from industrial development, warehouse

6    facilities, highways, and other sources.

7        93.    Plaintiffs are informed and believe, and on that basis allege, that the Project will allow

8    for and contribute to increased industrial buildout in and around Calwa, Malaga, and other nearby

9    residential areas, exacerbating existing noise, odor, air quality, and other environmental and public

10   health burdens.

11   **C.    Conflicts with Agency Efforts to Reduce Pollution Burdens in South Fresno**

12       94.    Calwa, Malaga, and other nearby communities have advocated for years for cessation

13   of new industrial facility siting in their neighborhoods, re-routing of truck traffic away from homes

14   and other sensitive land uses, improved environmental quality, and public and private investment in

15   their neighborhoods, including through sustained engagement in local and state land use and air

16   quality plans and policies.  Defendants' approval of the Project frustrates these efforts and

17   undermines state and local plans and policies designed to mitigate disproportionate pollution burdens.

18   The Project will also channel an estimated $119-146 million of state, local, and regional funds to

19   build out the new interchanges to further industrialization in the area, rather than simply support

20   efforts that could repair local roadways and improve bicycle and pedestrian infrastructure.

21   <u>**South Central Fresno AB 617 Designation and Community Emissions Reduction Program**</u>

22       95.    California Assembly Bill ("AB") 617 (Garcia, Stats. of 2017, ch. 136) initiated a

23   statewide effort to reduce air pollution exposure and improve public health in communities most

24   impacted by air pollution, including by implementing community-specific air quality monitoring

25   networks and Community Emission Reduction Programs ("CERPs") in selected communities.

26       96.    In 2018, the California Air Resources Board ("CARB") identified South Central

27   Fresno, which includes Calwa, Malaga, and other Project-adjacent communities and neighborhoods,

28   as a priority community for the first year of AB 617 implementation due to its heavy burden of air

21

pollution and other health and environmental challenges.  CARB and other agencies have since

expended $1.2 billion in efforts to reduce excess pollution burdens in South Central Fresno and other

AB 617 communities.

97.     Residents of Calwa, Malaga, and other nearby communities, as well as Plaintiffs and

other community-based organizations, have been heavily involved in AB 617 implementation

through membership and participation in the South Central Fresno Community Steering Committee

facilitated by the San Joaquin Valley Air Pollution Control District ("District").  In July 2019, the

District published a Community Air Monitoring Plan for South Central Fresno, developed in

partnership with the Steering Committee, which identifies heavy-duty trucks and industrial processes

in the area as among the "top sources of concern" and provides for air monitoring to inform and

monitor the success of emission reduction strategies.

98.     In September 2019, the District approved a CERP for South Central Fresno.  The

CERP, also developed in partnership with the Steering Committee and with input from other

community partners and residents, sets forth a holistic set of emission reduction strategies – including

community-centered investments, enhanced enforcement, increased outreach and training, cross-

agency collaboration, and other regulatory strategies – to reduce cumulative air pollution burdens

impacting the community.  The CERP highlights heavy-duty trucks and passenger vehicles traversing

major freeways, interchanges, and main roads that run through the community as major sources of

pollution, as well as industrial sources located near sensitive receptors.

99.     CERP strategies target heavy-duty vehicles, passenger cars, and new industrial

developments to reduce air pollution burdens.  The CERP also puts in place policies to reduce

community exposure to fine particulate matter, Toxic Air Contaminants, and nitrous oxides (NOx).

100.     The approval of the Project conflicts with CERP strategies and policies.  Among other

things, air pollutants targeted for reduction by the CERP may increase due to the expansion of heavy-

duty truck traffic capacity resulting from the Project and its facilitation of further industrial buildout.

101.     In addition, the City is conducting a Heavy-Duty Truck Routing Study to implement a

policy contained in the CERP.

102.     Plaintiffs are informed and believe, and on that basis alleged that approval of the

1  Project would predetermine the results of the Heavy-Duty Truck Routing Study and undermine

2  efforts to modify truck routes to reduce traffic flows in and around South Fresno communities.

3  **Senate Bill 1000**

4  103.   The Project conflicts with State policies intended to promote and prioritize

5  environmental justice, as well as ongoing efforts to update the County's General Plan to align with

6  these state requirements.  For example, Senate Bill ("SB") 1000, Cal. Gov. Code § 65302(h),

7  mandates that local agencies identify and describe disadvantaged communities and include

8  environmental justice policies in their general plans to "reduce the unique or compounded health

9  risks" for those communities.  Among other requirements, SB 1000 mandates policies to improve air

10  quality,reduce pollution exposures, and promote safe and sanitary homes for disadvantaged

11  communities.  SB 1000 also requires EJ policies that "promote public engagement in the public

12  decisionmaking process."

13  104.   California law defines environmental justice to include "deterrence, reduction, and

14  elimination of pollution burdens for populations and communities experiencing the adverse effects of

15  that pollution, so that the effects of the pollution are not disproportionately borne by those

16  populations and communities."  Cal. Gov. Code § 65040.12(e)(2).  It requires, "at a minimum, the

17  meaningful consideration of recommendations from communities most impacted by pollution into

18  environmental and land use decisions*." Id.*

19  105.   The County is in the process of updating its general plan to include an environmental

20  justice element and policies, as required by SB 1000.  In July 2021, the County released a draft

21  General Plan update.

22  106.   In March 2022, California Attorney General Rob Bonta issued a letter to the County

23  highlighting multiple deficiencies in the draft General Plan update's implementation of SB 1000.

24  The letter explained that the proposal failed to address the breadth of environmental issues faced by

25  Calwa and Malaga, failed to reduce pollution exposure for disadvantaged communities or buffer

26  existing or new sensitive land uses from many other sources of pollution, and failed to include

27  policies to address housing needs in these communities.  The letter further pointed out that the draft

28  General Plan update failed to prioritize improvements and programs that address the needs of

1   disadvantaged communities such as Calwa and Malaga.

2       107.    The Attorney General's letter took particular issue with proposed Policy No. ED-A.7,

3   titled "Locating New Industrial Sites," which would "encourage the location of new and expanding

4   industry within Fresno County" and provided that the "[i]nitial focus of potential new or redeveloped

5   industrial areas shall include Malaga [and] Calwa…."  According to the Attorney General, "[t]he

6   County's 'clear commitment' and 'unequivocal directive' to prioritize Malaga and Calwa for new or

7   redeveloped industrial sites in light of the known pollution burdens, health risks and population

8   demographics raises civil rights and environmental justice concerns."  These include likely violations

9   of the California Fair Employment and Housing Act, the duty to Affirmatively Further Fair Housing

10  under Government Code section 8899.50, and inconsistency with the South Central Fresno CERP.

11      108.    Residents of impacted communities echoed these concerns in comments to the

12  County, calling on it to incorporate effective environmental justice land use and policy changes into

13  the General Plan to reduce industrial development and attendant pollution in Calwa, Malaga, and

14  other overburdened areas.  The County is in the process of revising its proposed General Plan update

15  in response to these and other concerns.

16      109.    The Project conflicts with these state policies and community efforts to reduce further

17  industrial buildout in and around Calwa, Malaga and other nearby residential areas, and it undermines

18  ongoing County efforts to modify the underlying zoning and General Plan policies to discourage

19  further industrial development in these overburdened communities.  Instead, the Project is designed

20  on the premise that the areas surrounding the new interchanges will continue to be "designated as an

21  industrial and commercial zone by the County and City of Fresno where a consistent vision for land

22  use in the corridor supports traditional and emerging industrial and commercial business activities in

23  a designated industrial priority area."

24      110.    In addition to running counter to the state's environmental justice and air quality laws,

25  the Project conflicts with local planning processes meant to protect communities from impacts of

26  further industrial development.  For example, the City of Fresno is currently developing the South

27  Central Specific Plan, which will reconsider industrial land use in South Central Fresno, including in

28  the Project area.  The Fresno City Council announced that the Specific Plan will consider reductions

24

in zoning intensity near sensitive land uses in the area "to provide 'buffers' to protect sensitive uses from adverse impacts from more intense land use in a manner that reflects stakeholder input. This effort responds to comments from former Attorney General Xavier Becerra and others warning that continued industrial buildout would exacerbate air pollution burdens and health risks for residents in Calwa, Malaga, and other South Fresno communities. In furtherance of its General Plan objective to ensure adequate affordable housing, the City also initiated, but has not yet completed, a study to assess compatibility of further industrial buildout with existing residential neighborhoods.

### D. Caltrans' Environmental Process and Project Approval

### Draft Environmental Impact Report/Environmental Assessment

111. Caltrans is the public agency with principal responsibility for reviewing the Project under CEQA as well as NEPA, pursuant to assignment by the FHWA.

112. On March 8, 2019, Caltrans issued a Notice of Preparation that it would prepare a draft EIR for the Project under CEQA.

113. Caltrans issued and circulated the Draft EIR to the public for review and comment under CEQA between October 14, 2021 and December 3, 2021. The Draft EIR specified that the document would also serve as an Environmental Assessment ("EA") for purposes of NEPA.

114. Caltrans did not include technical studies relied on and underlying the Draft EIR/EA in the environmental document or make them publicly available on the Project website. The missing studies include but are not limited to: the Noise Impact Study (2020), the Paleontological Evaluation Report (Feb 2020), the Draft Relocation Impact Study (2020), the Initial Site Assessment (2020), the Historic Resource Evaluation Report (April 2020), the Historic Property Survey Report (May 2020), the Traffic Study (2020), the Location Hydraulics Study and Floodplain Evaluation Report (2018), Community Studies (2018-2022), and a Community Impact Memorandum (2020).

115. On November 29, 2021, counsel for Plaintiffs requested that an electronic copy of a Spanish translation of the Draft EIR/EA be made available to the public, and that the comment period be extended to run from the date that the Spanish translation was released.

116. Caltrans circulated a Spanish-language version of the Draft EIR/EA for public review and comment from December 15, 2021 to January 28, 2022.

117.    Despite the numerous barriers to public participation, a number of organizations submitted comments expressing concern with the Project.  These included comments by the District and by a coalition of local community-based organizations and residents, including Plaintiff and Petitioner Fresno BHC.  Friends of Calwa hosted meetings with Caltrans on April 22 and August 31, 2022, at which residents and staff expressed concerns with the likelihood that the Project would spur more industrial development and generate more truck traffic in the area, worsening air quality and habitability of these communities.  Several community groups including Fresno BHC and Friends of Calwa also submitted further written comments on October 12, 2022.

118.    Comments explained that the Draft EIR/EA failed to comply with CEQA in multiple respects, including but not limited to the following:

**Failure to Consider Environmental Justice Impacts**

119.    The Draft EIR/EA did not acknowledge the presence of Calwa, Malaga, or any other communities within the Project vicinity, nor did it acknowledge the poor quality of existing environmental conditions in these communities or the particular vulnerability of their residents to added pollution burdens.  Rather, the Draft EIR/EA stated that there are "no neighborhoods in or close to the project area," that "no minority or low-income populations were identified in the project area," that "no sensitive receptors have been identified for this project," and that "the closest residential neighborhoods [are] over two miles away" despite multiple communities being located within a 1.5 mile radius of the Project.

120.    The Draft EIR/EA did not acknowledge the presence of schools, places of worship, and other sensitive land uses, in addition to residential neighborhoods, along North Avenue, American Avenue, and other local roads onto which traffic using the Project interchanges flows.

121.    As a consequence, the Draft EIR/EA failed to record an accurate environmental baseline for the Project or to appropriately consider impacts on sensitive receptors and environmental justice.

**Failure to Analyze Vehicle Miles Traveled**

122.    CEQA establishes vehicle miles traveled ("VMT") as the "most appropriate measure of transportation impacts."  CEQA Guidelines § 15064.3(a); *see* Cal. Pub. Res. Code § 21099(b).

26

123.    The California Governor's Office of Planning and Research requires that, "[f]or any project that increases vehicle travel, explicit assessment and quantitative reporting of the amount of additional vehicle travel should not be omitted from the [CEQA] document."

124.    The Draft EIR/EA did not perform a VMT analysis.  Instead, the Draft EIR/EA stated that the Project is a "project type [] assumed to not lead to a measurable and substantial increase in vehicle miles traveled" and therefore does not require a VMT analysis under the "Caltrans Policy Memo (September 10, 2020) regarding analysis of transportation impacts under [CEQA] for projects on the State Highway System."  This was so even though the EIR/EA's air quality analysis pointed out that "the VMT estimated for each of the build alternatives would be slightly higher than for the No Build Alternative because the additional capacity of the interchanges increases efficiency of the interchanges and [allows] more direct access to local areas along [State Route] 99."

125.    The Draft EIR/EA did not explain what "project type" the Project falls under pursuant to the Caltrans Policy Memo.

126.    The Draft EIR/EA did not explain what characteristics of the Project contribute to its unlikelihood to increase vehicle miles traveled.

127.    The Draft EIR/EA did not explain why Caltrans assumed for purposes of a VMT analysis that the Project would not increase vehicle miles traveled, even as Caltrans identified increases in VMT and traffic capacity in other sections of its environmental analysis.

128.    Failure to consider and quantify the Project's VMT impacts infects and invalidates other components of the environmental analysis, including analysis of the Project's greenhouse gas ("GHG") emissions, air quality impacts, noise, vibration, light pollution, housing impacts, environmental justice impacts, and public health impacts.

**Failure to Fully Consider Cumulative Impacts**

129.    The Draft EIR/EA purported to perform a cumulative impacts analysis that considered the Project together with similar past, present, and reasonably foreseeable future actions.

130.    The Draft EIR/EA's cumulative impacts analysis listed only a handful of "cumulatively considerable projects:" development of the Central Pacific Railroad in the 1870s; construction of the Golden State Highway in 1927, later relocated to its existing site as State Route

27

99 in 1965; ongoing construction of the California High-Speed rail Project in the Project area; two nearby industrial projects (an Amazon Fulfillment Center and Ulta Beauty Distribution Center); implementation of the 2000 Fresno County General Pan and related Specific Plan; and the 2018 Regional Transportation Plan.

131.    The Draft EIR/EA did not consider in its cumulative impacts analysis similar State Route 99 projects, including the 19 capacity-increasing project candidates (two in Fresno County), 45 operational improvement project candidates (10 in Fresno County), and three new interchange candidate projects listed in the 2020 Route 99 Business Plan for Caltrans Districts Six and Ten.  Nor did Caltrans consider the cumulative impacts of its 2005 Route 99 Corridor Enhancement Master Plan intended to guide public and private sections decisions with the goal of "reliev[ing] congestion and improv[ing] the movement of goods" along State Route 99.

**Failure to Adequately Analyze Air Quality Impacts or Conflicts with Air Quality Plans**

132.    The Draft EIR/EA failed to acknowledge or consider inconsistencies with applicable air quality plans, including the South Central Fresno CERP and other measures to reduce air quality burdens under AB 617.  This was so even though the CERP recognized that the majority of air pollution emissions in South Central Fresno come from mobile and industrial sources.

133.    The Draft EIR/EA did not consider the Project's conflict with CERP Policy HD.11, Heavy-Duty Truck Routing, which provides that the Air District will work with the City and County of Fresno and Caltrans to support a Heavy-Duty Truck Routing Study to evaluate alternative truck routes.  Nor did it consider the possibility of conflicts with the Heavy-Duty Truck Routing Study in development under the CERP.

134.    The Draft EIR/EA did not acknowledge the presence of or consider air quality impacts associated with Project construction and operation on sensitive receptors in the Project vicinity.  The Draft EIR/EA's air quality analysis omitted consideration of certain emission categories highlighted in the CERP for reduction, including NOx.  The Draft EIR/EA also did not consider dust impacts on sensitive receptors from Project construction and operation or emissions resulting from tire wear.

135.    Because the Draft EIR/EA did not conduct a quantitative VMT analysis, it did not fully consider air quality impacts resulting from increases in VMT caused by the Project.

28

136.    The Draft EIR/EA also did not consider air quality impacts associated with industrial buildout, which the Project is intended to support.

**Failure to Include a Health Risk Assessment and Comply with Indirect Source Rule**

137.    In its comment to Caltrans, the San Joaquin Valley Air Pollution Control District requested that a Health Risk Assessment be performed to evaluate Project-related impacts, including by quantifying potential air pollution emissions from Project operation.

138.    The District specifically asked that the Health Risk Assessment identify operational emissions of Toxic Air Contaminant pollutants, which pose hazards to human health and which were not assessed by Caltrans in the EIR/EA.  Adverse health impacts of Toxic Air Contaminants include damaged organs, birth defects, cancer, immune system damage, neurological damage, and reproductive damage.  The District noted the existence of numerous sensitive receptors in the Project area, including residences, a juvenile facility, healthcare facilities, and day-care facilities, all of which could be impacted by such emissions.  The District emphasized its strong recommendation that projects resulting in a significant health risk not be approved by the lead agency.

139.    The District also notified Caltrans in its comment that Caltrans was required to ensure compliance with District Rule 9510 (Indirect Source Rule) in its approval of the Project.  The purpose of District Rule 9510 is to reduce NOx and $PM_{10}$ emissions associated with construction and operation of development and transportation projects.  Because the Project's construction exhaust emissions exceed two tons of NOx or $PM_{10}$, the Project is subject to the rule, and Caltrans was therefore required to submit an application to the District *prior to* Project approval with documentation supporting an Air Impact Assessment to quantify NOx and $PM_{10}$ emissions and ensure appropriate mitigations.

**Final EIR/EA and Project Approval**

140.    On February 6, 2023, Caltrans filed a Notice of Determination of its approval of the Project, triggering the 30-day statutory deadline under CEQA to challenge the certification of the Final EIR.  CEQA Guidelines § 15112(c)(1).

141.    The Notice of Determination stated that Caltrans approved the Project on January 30, 2023.  It also linked to a Caltrans website containing the Final EIR/EA, dated "January 2023."

VERIFIED PETITION AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO.

142.    The Final EIR/EA set forth a new alternative not included or considered in the Draft EIR/EA – a hybrid of Alternatives 1 and 2 for the American Avenue Interchange – which Caltrans identified as the Preferred Alternative along with Alternative 2 for North Avenue.  The Final EIR/EA failed to analyze multiple categories of environmental impacts for the Hybrid Alternative, including but not limited to a traffic and VMT analysis and air quality analysis.

143.    In response to comments, the Final EIR/EA defended its decision not to consider impacts on Calwa, Malaga, and other adjacent communities and sensitive land uses like the nearby juvenile detention facility, instead deeming them "outside the project area."  And it declined to update the substantive analyses in the EIR/EA to consider impacts on these and other adjacent communities.  In support of this finding, the Final EIR/EA reduced the Project area for the environmental justice and community cohesion analysis from two miles in the Draft EIR/EA to 0.5 miles, asserting that the Project area in the Draft EIR/EA was "incorrectly labeled."

144.    The Final EIR/EA defended Caltrans' decision not to conduct a VMT analysis by stating that Project sponsors determined, based on "the project timeline, which is tied to critical funding, and the absence of an established process to complete [VMT] analysis," "to proceed with the recommendation not to implement [VMT] analysis on this project."  The Final EIR/EA did not explain why the Project was subject to a case-by-case determination for VMT analysis.

145.    The Caltrans Policy Memo sets forth factors that ordinarily require a VMT analysis for projects subject to a case-by-case determination, including "[a] high level of public and stakeholder interest in the project."  The Final EIR/EA did not explain whether this or any other factors that would trigger a VMT analysis apply to the Project.

146.    The Final EIR/EA brushed aside Plaintiffs' request that Caltrans delay approval of the Project pending completion of the Heavy-Duty Truck Routing Study and South Central Specific Plan, asserting in response to comments that the plan and study "are being conducted by the City of Fresno, independent of" the Project.

147.    The Final EIR/EA acknowledged that the Project is subject to Rule 9510 but defended its failure to submit an Air Impact Assessment application prior to Project approval, asserting that an application need only be submitted prior to construction.  Caltrans ignored the District's

recommendation to condition approval of the Project on demonstration of compliance with District

Rule 9510, instead stating that "Caltrans and the construction contractor will work with the [District]

to obtain approval of the Air Impact Assessment" but without specifying any timeline for

compliance.  The Final EIR/EA also set forth a new mitigation measure, HW-7, that purported to

make the future Project construction contractor responsible for the Air Impact Analysis.

148.    The Final EIR/EA set forth new mitigation for significant GHG increases attributable

to the Project, including the installation of a vegetative barrier and sidewalk on Cherry Avenue by

Orange Center Elementary School, in addition to the installation of one electric charging station

proposed in the Draft EIR/EA.  The Final EIR/EA describes the vegetative barrier as a "recognized

metho[d] of mitigating greenhouse gas emissions" but provides no details about the barrier, such as

type of vegetation, size, or time to maturity.  And the Final EIR/EA makes no attempt to quantify or

otherwise evaluate the extent of GHG reductions likely to result from this or other mitigation.

149.    Caltrans adopted the new Hybrid Alternative for the American Avenue interchange

and Alternative 2 for North Avenue as the Project and certified the Final EIR/EA.  Caltrans also

adopted a statement of overriding considerations to support its approval of the Project despite

"significant and unavoidable" impacts on GHG emissions but failed to explain why these impacts

could not be reduced to insignificance through feasible mitigation measures.

150.    Together with issuance of the Final EIR/EA, Caltrans issued a FONSI for the Project

under NEPA, dated January 24, 2023.  The FONSI stated the Hybrid Alternative at American Avenue

and Alternative 2 at North Avenue "will have no significant impact on the human environment,"

without further analysis or explanation.

151.    Caltrans did not provide a public comment period on the FONSI, despite requests by

Plaintiffs' counsel.

152.    After filing of the Notice of Determination, counsel for Plaintiffs contacted Caltrans

via email on January 27, 2023, requesting underlying technical studies relied on by the EIR/EA.

Caltrans responded on February 13, 2023 with a subset of the documents relied on by the EIR/EA.

Upon subsequent request, Caltrans disclosed a further set of studies between February 22 and

February 24, 2023.

## VI.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## VIOLATIONS OF NATIONAL ENVIRONMENTAL POLICY ACT

### (Against all Defendants)

153.    Plaintiffs incorporate herein by reference the allegations contained in the foregoing paragraphs.

154.    Defendants have failed to prepare adequate environment review documents, to satisfy their duty to provide full and good faith public disclosure of the Project's impacts, and to provide for public comment and participation in the public review process, in violation of NEPA and its implementing regulations.  42 U.S.C. § 4331 et seq.; 40 C.F.R. § 1500.1 et seq.

155.    As a result of these violations, Defendants' NEPA documentation, FONSI, and approval of the Project are arbitrary, capricious, and otherwise not in accordance with law, in violation of 5 U.S.C. section 706.

156.    These deficiencies include, without limitation, the following:

### Failure to Prepare an EIS

157.    Defendants unlawfully failed to prepare an EIS even though substantial evidence in the record showed that the Project is likely to cause significant impacts on the environment.  23 C.F.R. § 771.123(a).

158.    Defendants failed to prepare an EIS even though substantial questions were raised about significance of multiple factors, such as adverse effects on air quality, public health, and safety, and possible violation of federal and state laws and local planning processes meant to protect the environment.  40 C.F.R. § 1501.3(b); *Ocean Advocates*, 402 F.3d at 864 (requiring that an "[i]mpact statement must be prepared if substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor").

159.    Defendants erred in issuing a FONSI despite evidence in the record showing the existence of significant adverse environmental effects, including but not limited to Caltrans' findings that the Project would have significant and unavoidable impacts on GHG emissions.

160.    Defendants erred in their determination of environmental significance by failing to

32

consider appropriately the relevant context and intensity of possible environmental effects, including direct, indirect, and cumulative effects. *See Bark v. United States Forest Serv.*, 958 F.3d 865, 869 (9th Cir. 2020).

161.    Defendants' FONSI was conclusory and did not reflect adequate consideration of relevant factors necessary for understanding the environmental effects of the Project. *Ocean Advocates*, 402 F.3d at 864.

### Inadequacy of Environmental Assessment

162.    Defendants failed to consider the full extent of direct, indirect, and cumulative effects of the Project by limiting consideration of impacts to only those within the "Project area," which the EIR/EA narrowly defined as "all properties that would be potentially purchased and converted to transportation use" within a half mile from the center of the new interchanges.  This narrow definition fails to acknowledge, despite substantial evidence in the record, that impacts of the Project extend beyond its immediate physical footprint.  As a result, the EIR/EA improperly omits from its description of environmental setting any acknowledgment of the thousands of residents in Calwa, Malaga, and other impacted communities, and it fails to consider impacts on these residents and other sensitive receptors and land uses within 1.5 miles of the Project, including schools, places of worship, and businesses.  Further, the EIR/EA failed to consider the unique risks of the Project to impacted disadvantaged communities whose members are particularly vulnerable to environmental effects.

163.    The EIR/EA failed to consider the effects of the Project when combined with other similar past, present, and reasonably foreseeable future projects – including the numerous related Caltrans District Six highway expansion projects planned or undertaken along the State Route 99 Corridor under Caltrans' State Route 99 Corridor Enhancement Master Plan and State Route 99 Business Plan, as well as industrial buildout in South Central Fresno.

164.    The EIR/EA failed to adequately analyze the Project's impacts on important sources of air pollution emissions impacting nearby communities, including NOx, dust, and emissions associated with tire wear, as well as pollution resulting from further industrial buildout facilitated by the Project.

165.    The EIR/EA's findings regarding the Project's impact on air quality, health, dust

33

exposure, scenic vistas and public views, light and glare, noise, vibration, environmental justice, and other resources are unsupported by substantial evidence in the record, in violation of 5 U.S.C. section 706(2)(E), and Defendants have failed to articulate a satisfactory explanation establishing a rational connection between the facts found and the conclusions made.

166.    The EIR/EA's conclusory finding that the Project was not a Project of Air Quality Concern and did not warrant a Hot Spot Analysis is not supported by substantial evidence in the record.

167.    The EIR/EA failed to consider a reasonable range of alternatives, as required by NEPA and its implementing regulations, including alternatives that would address existing traffic safety impacts on local communities and deterioration of local roadways without expanding traffic flow and capacity, causing air pollution and other adverse impacts, or inducing additional industrial buildout in South Fresno.  Likewise, the EIR/EA violated NEPA by defining the Project's objectives so narrowly as to exclude a meaningful analysis of reasonable, less impactful, alternatives.

### Failure to Provide for Public Participation

168.    Defendants failed to ensure that all relevant information about the Project and its environmental effects was made available to the public by failing to acknowledge the existence of impacted vulnerable communities and by failing to include adequate discussion of environmental justice, air quality, and other impacts in the EIR/EA.  *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1500.1(a).

169.    Defendants failed to make technical information, studies, and reports relied on and incorporated into the EIR/EA and data underlying the EIR/EA's findings and conclusions readily available to the public.

170.    Defendants failed to provide meaningful opportunity for Spanish-speaking residents to participate in the NEPA process.  In particular, Defendants only released a Spanish translation of the EIR/EA following requests, despite the majority of residents in nearby communities speaking Spanish at home.  Defendants also failed to make readily available Spanish-language versions of studies and reports relied on by and incorporated into the Final EIR/EA.

171.    Defendants failed to adequately respond to public comments on the EIR/EA.

34

172.    Defendants failed to allow for public review of the FONSI even though the Project is closely similar to one that ordinarily requires an EIS.  40 C.F.R. § 1501.6(a)(2)(i).

## SECOND CAUSE OF ACTION

### VIOLATIONS OF THE CALIFORNIA ENVIRONMENTAL QUALITY ACT

### (Against Defendant Caltrans)

173.    Plaintiffs incorporate herein by reference the allegations contained in the foregoing paragraphs.

174.    Caltrans violated CEQA by certifying a legally deficient EIR and by approving the Project without adequate environmental review, including but not limited to the following defects:

### Inadequacy of Environmental Impact Report

175.    Caltrans unlawfully piecemealed environmental review of the Project in its entirety by failing to consider environmental impacts of related approvals under Caltrans' State Route 99 Business Plan and State Route 99 Corridor Enhancement Master Plan.

176.    The EIR/EA failed to consider a reasonable range of alternatives, as required by CEQA, including alternatives that would address existing traffic safety impacts on local communities and deterioration of local roadways without expanding traffic flow and capacity, causing air pollution and other adverse impacts, or inducing additional industrial buildout in South Central Fresno. Likewise, the EIR/EA violated CEQA by defining the Project's objectives so narrowly as to exclude a meaningful analysis of reasonable, less impactful, alternatives.

177.    Caltrans failed to "include a description of the physical environmental conditions in the vicinity of the project" that reflects conditions "as they exist at the time the notice of preparation is published."  CEQA Guidelines § 15125(a), (a)(1).  Among other things, the EIR/EA unlawfully failed to acknowledge the presence of numerous proximate communities, residences, schools, places of worship, and thousands of sensitive receptors that could be impacted by the Project, or to disclose the unique vulnerabilities of adjacent disadvantaged communities.  The incomplete and inaccurate baseline description infects and invalidates the entirety of the EIR/EA's environmental analysis.

178.    Caltrans failed to adequately consider the full scope of the Project's direct and indirect effects on the environment.  CEQA Guidelines § 15126.2(a).

179.    Caltrans failed to adequately identify and analyze cumulative effects of the Project by ignoring its incremental effects "in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects." CEQA Guidelines §§ 15065(a)(3), § 15130(a).  The EIR/EA's cumulative impacts analysis considered only around seven projects and plans, one of which dates back to 1870 and another to 1927.  It wholly ignored numerous closely related past, present, and probable future projects, including related Caltrans District Six highway expansion activities (over a dozen of which are in Fresno County alone) and all but two industrial development projects in the Project area.  As to the related projects it did consider, the cumulative impacts analysis was conclusory and lacked reasoning, analysis, or supporting documentation.

180.    Caltrans failed to present quantitative VMT information in its transportation analysis as required by Public Resources Code section 21099(b) and CEQA Guidelines sections 15064.3(a) and 15007(d).  Indeed, Caltrans failed to perform any VMT analysis at all even though the EIR/EA's air quality analysis pointed out that "the VMT estimated for each of the build alternatives would be slightly higher than for the No Build Alternative because the additional capacity of the interchanges increases efficiency of the interchanges and [allows] more direct access to local areas along [State Route] 99."

181.    Caltrans failed to comply with the requirements for conducting a VMT analysis under Caltrans' September 10, 2020 Memorandum regarding Caltrans Policy on Transportation Impact Analysis and CEQA Significance Determinations for Project on the State Highway System.

182.    Caltrans failed to adequately analyze the Project's impacts on important sources of air pollution emissions impacting nearby communities, including NOx, dust, and emissions associated with tire wear, as well as pollution resulting from further industrial buildout facilitated by the Project.

183.    Caltrans' discussion of construction and operational impacts of the Project on air quality, dust, aesthetic impacts, light and glare, noise, and vibration, among other impacts, is inadequate, conclusory, and lacking substantial evidentiary support.

184.    Caltrans failed to adequately analyze the Project's air quality impacts from NOx and $PM_{10}$ by refusing to submit documentation for and undertake the Air Quality Assessment required by District Rule 9510 prior to Project approval.

185.    Caltrans failed to adequately discuss the inconsistencies between the Project and State laws and local air quality implementation plans.  CEQA Guidelines § 15125(d).  For example, the EIR/EA fails to evaluate the Project's consistency with the CERP.  Likewise, Caltrans failed to discuss the conflict between the Project and other land use plans and policies under development, including but not limited to the South Central Specific Plan and pending updates to the County of Fresno General Plan (including environmental justice policies to reduce industrialization and polluting land uses in South Fresno).  *Id.*

186.    The EIR/EA impermissibly defers developing the details of mitigation measures to reduce GHG impacts, including details regarding installation of a vegetative barrier.  CEQA Guidelines § 15126.4(a)(1)(B).  By failing to set forth details regarding when and by whom the vegetation barrier will be installed, the EIR/EA also impermissibly fails to ensure that mitigation will be implemented before adverse impacts occur.

187.    Mitigation measure HW-7 in the Final EIR/EA impermissibly defers developing details of mitigation for adverse air quality impacts from NOx and $PM_{10}$ and fails to ensure that mitigation will be timely implemented before construction-related air quality impacts occur.  *Id.*

188.    Caltrans failed to make adopted mitigation measures, including mitigation for GHG impacts, NOx, and $PM_{10}$, "fully enforceable through permit conditions, agreements, or other legally-binding instruments."  *Id.* § 15126.4(a)(2).  Among these shortcomings, Caltrans impermissibly outsourced Rule 9510 compliance to a third-party contractor, and it failed to condition Project approval on or otherwise adopt legally-binding instruments to ensure Rule 9510 compliance and development of a vegetative barrier and other mitigation to offset Project-related GHG emissions.

### Inadequacy of Statement of Overriding Considerations

189.    Caltrans unlawfully approved the Project despite substantial and unmitigated GHG impacts without evaluating whether feasible mitigation could be developed and implemented to reduce GHG impacts to insignificance.

190.    Caltrans failed to support the adopted Statement of Overriding Considerations with substantial evidence in the record.  The findings do not provide the reasoning or analytic route from facts to conclusions, as required by law.  CEQA Guidelines § 15093(b).

**Failure to Provide for Meaningful Public Participation**

191.    Caltrans failed to adequately evaluate and respond to comments received on the Draft EA/EIR and failed to offer a good faith, adequately reasoned analysis in its responses.  Cal. Pub. Res. Code § 21091(d); CEQA Guidelines § 15088(a), (c).

192.    Caltrans failed to adequately respond to major environmental issues raised in comments, including issues related to air quality and health concerns raised by the San Joaquin Air Pollution Control District.  CEQA Guidelines § 15088(c).  In particular, Caltrans failed to provide reasoning and data to support its inconsistent conclusion that a Health Risk Assessment was not needed for the Project.

193.    Caltrans failed to make technical studies relied on and incorporated into the EIR/EA and data underlying the findings and conclusion in the EIR/EA readily available to the public.

194.    Caltrans failed to analyze and disclose environmental impacts associated with the Hybrid Alternative adopted in the Final EIR/EA, and it failed to recirculate the Final EIR/EA to allow the public to review and comment on this change.  CEQA Guidelines § 15088.5

195.    Caltrans failed to provide meaningful opportunity for Spanish-speaking residents to participate in the CEQA process.  In particular, Caltrans only released a Spanish translation of the EIR/EA following requests, despite the majority of residents in nearby communities speaking Spanish at home.  Caltrans also failed to make technical studies and reports relied on and incorporated into the EIR/EA available in Spanish.

196.    By certifying the Final EIR and by approving the Project, Caltrans committed a prejudicial abuse of discretion, failed to proceed in the manner required by law, and acted without substantial evidentiary support.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(1) Declare that Defendants' Environmental Assessment and Finding of No Significant Impact violates the APA, NEPA, and NEPA's implementing regulations.

(2) Declare that Defendants violated NEPA by failing to prepare an Environmental Impact Statement.

(3) Vacate Defendants' Environmental Assessment and Finding of No Significant Impact and remand to the agencies.

(4) Declare that Caltrans' Environmental Impact Report violates CEQA.

(5) Issue a peremptory writ of mandate commanding Defendants to vacate and set aside the certification of the EIR/EA, their approvals of the Project, and any and all approvals rendered pursuant to and/or in furtherance of all or any part of the Project.

(6) Preliminarily and permanently enjoin Defendants from constructing and operating the Project, and from taking any action to implement, fund, or construct any portion or aspect of the Project, unless and until Defendants comply with NEPA and CEQA.

(7) Order Defendants to conduct a new environmental review process that complies with NEPA and CEQA's requirements as set forth herein.

(8) Award Plaintiffs their reasonable attorneys' fees, costs, expenses, and disbursements associated with this action.

(9) Grant Plaintiffs such additional relief as the Court may deem just and proper.

VERIFIED PETITION AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO.

Respectfully submitted,

DATED:  March 8, 2023

ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School


By:  _____/s/ Stephanie L. Safdi_____
Deborah A. Sivas
Stephanie L. Safdi
Rica V. Garcia

DATED:  March 8, 2023

LEADERSHIP COUNSEL FOR JUSTICE AND
ACCOUNTABILITY


By:  _____/s/ Ashley E. Werner_____
Ashley E. Werner, Directing Attorney

Attorneys for Plaintiffs and Petitioners
FRIENDS OF CALWA, INC. and FRESNO
BUILDING HEALTHY COMMUNITIES

VERIFIED PETITION AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO.

## VERIFICATION

I, Sandra Celedon-Castro, am the President and Chief Executive Officer (CEO) of Fresno Building Healthy Communities, which is a non-profit organization and party to this action. I am authorized to make this verification for and on behalf of Plaintiffs and Petitioners, and I make this verification for that reason. I hereby certify that I have read the foregoing PETITION FOR WRIT OF MANDATE AND COMPLAINT and the contents thereof are true and accurate to the best of my knowledge and belief.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 8, 2023, at Fresno, California.


_____
Sandra Celedon-Castro
FRESNO BUILDING HEALTHY COMMUNITIES

Case No.

VERIFICATION