**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FRIENDS OF CALWA, INC., et al.,<br>Plaintiffs,<br>v.<br>CALIFORNIA DEPARTMENT OF TRANSPORTATION, et al.,<br>Defendants. | Case No. 1:23-cv-00353 JLT EPG<br>ORDER GRANTING MOTION TO DISMISS IN PART WITH LEAVE TO AMEND<br>(Doc. 30) |

The plaintiffs in this action are two nonprofit organizations whose goals include advocacy for people living in the Fresno area. (*See* Doc. 80 ¶¶ 19, 21.) They are pursuing claims under the National Environmental Policy Act (NEPA) against the California Department of Transportation (Caltrans), among other defendants. They claim that Caltrans has decided to move forward with a highway interchange construction project in the Fresno area without thinking carefully about the project's likely effects on the people who live nearby, such as an increase in pollution caused by an increase in heavy truck traffic. Caltrans has moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). With the exception of a few claims and allegations that the plaintiffs do not defend, the operative complaint states a claim under the Administrative Procedure Act (APA) and NEPA. The motion is therefore **GRANTED IN PART** with leave to amend, as explained in this order.

## BACKGROUND

The purpose of NEPA is to "encourage productive and enjoyable harmony" with our environment. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004) (quoting 42 U.S.C. § 4321). It "was intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States." *Id.* (quoting 42 U.S.C. § 4321). "At the heart of NEPA is a requirement that federal agencies 'include in every recommendation or report on proposal for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement' . . . called an Environmental Impact Statement (EIS)." *Id.* at 757 (quoting 42 U.S.C. § 4332(2)(C)).

Not every federal action is subject to this requirement. *See id.* Under the regulations that governed Caltrans's decision in this case, agencies could "prepare a more limited document" when deciding whether an EIS was necessary. *See id.* (citing regulations). This more limited document, known as an "environmental assessment" or EA, is a "concise" collection of "evidence and analysis for determining whether to prepare an EIS." *Id.* (quoting 40 C.F.R. § 1508.9(a) (2003)). "If, pursuant to the EA, an agency determines that an EIS is not required . . . , it must issue a 'finding of no significant impact' (FONSI), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." *Id.* at 757–58 (citing 40 C.F.R. §§ 1501.4(e), 1508.13 (2003)).

Caltrans is not a federal agency, so its actions would not normally qualify as "federal actions" for purposes of NEPA, but it has accepted federal responsibility for the construction project in this case by signing a memorandum of understanding with the Federal Highway Administration. (*See* Doc. 30-3 Exs. 1–2); *see also* 23 U.S.C. § 327.[1] Caltrans prepared an EA and issued a FONSI. It found "no significant impacts" and published a notice to that effect. (*See* Doc. 80 ¶ 133); EA at 8.[2] That finding, along with the process and reasoning behind it, are the

---

[1] It is appropriate to take judicial notice of any facts that, like these, "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

[2] The Court takes judicial notice of the contents of this document. At the time this order was filed, the final version was publicly available on Caltrans's website at https://dot.ca.gov/caltrans-near-me/district-6/district-6-projects/06-0h240. Caltrans also filed excerpts on the docket of this action. (*See* Doc. 30-3.)

subject of the plaintiffs' NEPA claim. They allege Caltrans's decision was "arbitrary" and "capricious" in terms of the APA and "in violation of NEPA and its implementing regulations." (Doc. 80 ¶ 176.)

The story, as they tell it, begins long before divided highways like Route 99 were built across California. In Fresno, as in so many other U.S. cities, early twentieth-century land use rules and redlining practices pushed polluting industries into the same neighborhoods where many non-white residents had made their homes. (*See id.* ¶¶ 52–53.) Later, when planners decided where to build State Route 99 in the 1950s, they laid it through Fresno like a wall, dividing many of the city's wealthier residents from its poorer and more heavily polluted neighborhoods, where more residents were not white. (*See id.* ¶ 54.)

These divisions persist today in places like Calwa and Malaga, where 90 percent or more of the residents identify as Hispanic or Latino. (*Id.* ¶ 51.) Family budgets in these places are often much tighter than those in other neighborhoods, as is evident, for example, from the fact that almost all of the students at the local elementary schools qualify for free or reduced-price meals. (*Id.*) These neighborhoods also bear a greater share of the harm that comes with industrial development. Heavy-duty trucks use Route 99 and nearby surface roads, which run alongside homes, parks, and the places where people gather to worship. (*See id.* ¶ 55.) Diesel exhaust and road dust contaminate the air, which is more heavily polluted than almost everywhere else in California. (*See id.* ¶¶ 57–59.) People visit the emergency room for asthma more than most other places in California, and they have higher rates of cardiovascular disease. (*See id.* ¶ 59.) According to one study, life expectancy in some South Fresno neighborhoods is twenty years shorter than in others nearby. (*Id.*)

The highway construction project at issue in this case would increase the capacity of two interchanges near Calwa and Malaga. (*See id.* ¶¶ 72–73.) It would make it easier for a larger number of cars and trucks to exit Route 99 and enter local surface streets. (*See id.*) It is part of a

---

For simplicity, the Court cites this document as the "EA" in the remainder of this order, with page number citations corresponding to the pages of the publicly available pdf (i.e., those running from 1 to 312). To be clear, the Court does not take judicial notice that any factual statement or assertion within the draft or final document is true or correct, but rather only that the EA contains the cited statement or assertion. *See Khoja*, 899 F.3d at 999.

longer-term plan to foster the development of a nearby "industrial park" and more generally to increase traffic capacity along Route 99. (*Id.* ¶¶ 64–65, 78–81.) The plaintiffs oppose the project because they believe that it will lead unjustly to more pollution, more road noise, more glare, and other similar problems. When Caltrans published a draft EA in late 2021, the plaintiffs objected to it in a letter.[3] (*See id.* ¶¶95–96; *see also* Doc. 30-3 at 67–86.) Their arguments fall in four broad categories.

First, the plaintiffs expressed concerns about what appeared to be a misunderstanding on Caltrans's part: that there were "no neighborhoods in or close to the project area" and "no minority or low-income populations." (*Id.* at 68–71.) The agency seemed not to have reckoned with the fact that there were schools, places of worship, and homes in the vicinity. (*See id.*) The plaintiffs argued similarly that Caltrans had simplistically and wrongly portrayed the area as commercial or industrial. (*See id.* at 81–82.)

Second, the plaintiffs argued that Caltrans had not analyzed and taken account of the project's potential to induce a greater volume of car and truck traffic through their neighborhoods. (*See id.* at 71–73.) If the two interchanges had a higher capacity and were better suited to heavy truck traffic, then that type of traffic was likely to increase at a greater rate than it would have if Caltrans had simply repaired and maintained the interchanges as they now stand. (*See id.*)

Third, building on the previous point, the plaintiffs wrote that Caltrans had not analyzed the likely effects of increased traffic and industrial development, such as greater air pollution, which would come at a cost to the local residents' health and well-being. (*See id.* at 74–77.) The letter also emphasized a number of similar problems, from increases in light pollution and glare to greater vibration and noise. (*See id.* at 77–81.) It argued that Caltrans had failed to account for these likely consequences. (*See, e.g.*, *id.* at 74.)

Fourth, the plaintiffs argued that the project's goals were at odds with Caltrans's duties under California's antidiscrimination and environmental justice laws. (*See id.* at 82–83 (citing Cal. Gov't Code §§ 8899.50, 11135, 12995).) They argued that the interchange improvements

[3] The record includes other correspondence as well. The parties disagree whether it is appropriate to consider that correspondence now. It is not necessary to resolve the disagreement. The letter that both parties rely on includes adequate information for purposes of the pending motion.

would reinforce the longstanding and inequitable divisions between Fresno's northern and southern neighborhoods. (*See id.*)

Caltrans reviewed these comments but found "no significant impacts," and it published a notice to that effect, i.e., the "FONSI" discussed above. EA at 8. It finalized its environmental report, which includes written responses to the plaintiffs' letter. (*See* Doc. 80 ¶¶ 133); EA at 294–305.

First, in response to the plaintiffs' comment that Caltrans appeared to have ignored or disregarded the nearby homes, schools, and churches, the agency explained that it had made essentially a typographical error. It wrote that its draft had "incorrectly defined the size of the project area." *Id.* at 297. It was not "2 miles from the location of the interchanges," as it had written, but rather much smaller, "approximately a half mile from the center of State Route 99 and the interchange." *Id.* at 296–97. This meant that it had not described the nearby neighborhoods inaccurately or overlooked nearby homes and schools, etc., but instead had excluded these areas from direct consideration. But Caltrans also cited "community studies" that it had conducted in 2019 and 2020, which had "identified communities and neighborhoods in South Central Fresno" nearby. *Id.* Caltrans reiterated its finding that the project area itself was "made up mostly of industrial and commercial businesses," not homes, schools, and neighborhoods, and it decided that no further revisions or environmental studies were necessary. *Id.*

Second, in response to the plaintiffs' comments about the project's potential to spur greater traffic and industrial development, Caltrans wrote that local cities and counties would retain their authority to make zoning and land use decisions. *See id.* at 295. It believed that "traffic conditions and the subsequent air quality will continue to worsen if no improvements are made," *id.* at 296, and it wrote that it had complied relevant regulations on studies of vehicle miles traveled, *id.* at 298. Based on a "Traffic Operations Analysis Report," Caltrans did not believe that traffic would increase as a result of the project. *Id.* at 299.

Third, Caltrans responded to the plaintiffs' concerns about air and noise pollution by citing its conclusion that "[w]ithout the proposed project in place, future traffic would become

congested" on both Route 99 and the neighborhood roads, which meant that in these places people could be "exposed to higher levels of air pollution" if the project did not move forward. *Id.* at 298. Caltrans also found that the project complied with state and federal law, *id.*, state standards, *id.* at 300, and the regional transportation plan, *id.* at 299. As for the project's visual and aesthetic effects, Caltrans cited a "Visual Impact Analysis" prepared in September 2020, which "determined the project will have a moderately low visual impact." *Id.* at 301. "The structures proposed by the project will not block and scenic vistas because they will be approximately the same height as the current structures." *Id.* Caltrans did not believe that the project would cause any new sources of light or glare; it could even lead to less glare from truck traffic. *See id.* And by its analysis, construction noise and vibration would not disturb local residents. *See id.* at 302–04.

Finally, with respect to the plaintiffs' concerns about longstanding inequities and state anti-discrimination laws, Caltrans wrote that it had "followed the public processes required under the California Environmental Quality Act," more commonly known as CEQA; had held public meetings and had given "the public numerous opportunities to review and comment"; and had revised its EA "to acknowledge the presence of Environmental Justice communities near the project area." *Id.* at 304–05.

The final EA was released in January 2023, and the agency's notice of its decision was filed in early February. *See id.* at 1; (*see also* Doc. 80 ¶ 133.) The plaintiffs filed this lawsuit about two months later, in March, against both Caltrans and the Federal Highway Administration. (Doc. 1.) Their original complaint included two claims: first, they alleged that Caltrans and the Federal Highway Administration had violated NEPA; second, they alleged that Caltrans had violated CEQA. (*See id.* at 33–38.) They amended their complaint in June 2023 to assert a claim against the Federal Highway Administration and the U.S. Department of Transportation under the federal Clean Air Act (*see* Doc. 14 at 45–49), and they reasserted their NEPA and CEQA claims, but against Caltrans only (*see id.* at 49–55). They also asserted a claim against Caltrans under state civil rights and anti-discrimination laws. (*See id.* at 56–61.)

In the months that followed, the parties attempted to negotiate an agreement that would

allow the plaintiffs to pursue all of their claims in one case and one court, rather than in two parallel cases in both state and federal courts. Caltrans eventually decided, however, that it would not consent to federal jurisdiction over the state-law claims, so it moved to dismiss them on jurisdictional grounds. (*See* Docs. 30 at 2; 30-2 at 8–12; 37 at 14–15; 37-1 at 2–7.) Caltrans also moved to dismiss the NEPA claim under Rule 12(b)(6) for failure to state a claim on the merits. (*See* Doc. 30-2 at 12–24.) The plaintiffs agreed to dismiss their state law claims voluntarily and refile them in state court, and they opposed the motion to dismiss their NEPA claim. (*See* Docs. 37 at 14–15.) The Court then granted the motion to dismiss in part as to the state law claims against Caltrans. (*See* Doc. 48.) The motion to dismiss has therefore remained pending, but only in part, as to the NEPA claim. (*See id.*)

In state court, the state-law claims moved forward against Caltrans. *See Friends of Calwa, Inc. v. Cal. Dep't Transp.*, No. 23CECG04109. The superior court denied the plaintiff's writ of mandate in part in April 2026. It found that Caltrans had established an affirmative defense to the CEQA claim under the statute of limitations. (Doc. 78 at 5–20.)[4] In the meantime, the federal agency defendants moved to remand this case in part for further administrative proceedings at the federal level. (*See* Doc. 49.) The plaintiffs did not oppose that motion (Doc. 50), and it was granted (Doc. 53). The Federal Highway Administration completed its remand process in late 2025. (Doc. 74 at 2.) The parties then agreed that the plaintiffs should be permitted to file a second amended complaint, which would serve as the operative pleading for purposes of Caltrans's pending motion. (*See* Doc. 79.) The Court approved their stipulation and ordered accordingly. (*Id.*)

The upshot of this history is that the pending motion focuses solely on the plaintiffs' NEPA claim against only Caltrans. That claim is based on three alleged "deficiencies" in Caltrans's environmental review process: (1) that Caltrans was required to prepare an EIS, not just an EA, because the project is likely to cause significant impacts on the environment (*see* Doc. 80 ¶¶ 179–83); (2) that the EA fell short on its own merits because it was unduly limited as a

---

[4] It is appropriate to take judicial notice of these matters. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir.2006) ("[A federal court] may take judicial notice of court filings and other matters of public record.").

matter of geography, time, and subject matter (*see id.* ¶¶ 184–89); and (3) Caltrans did not make relevant information available to the public and did not allow for public review of its FONSI (*id.* ¶¶ 190–94). Caltrans's motion is fully briefed. (*See* Docs. 30-2, 37, 41.) The Court determined that oral arguments would not be necessary. (Doc. 31.)

**LEGAL STANDARD**

Because Caltrans moves to dismiss under Federal Rule of Civil Procedure 12(b)(6), the plaintiffs are entitled to the assumption that the factual allegations within it are true, as well as the benefit of any reasonable inferences that can be drawn from those allegations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Caltrans's motion can be granted only if the complaint lacks "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

**EXHAUSTION AND WAIVER**

Caltrans relies primarily on the argument that the plaintiffs did not exhaust their NEPA claim administratively before they filed this lawsuit. (Doc. 30-2 at 13, 15.) It argues that they did not cite NEPA, rely on NEPA, or raise concerns about the agency's compliance with NEPA during the environmental review process. (*Id.* at 13–20.) The plaintiffs believe that Caltrans has relied on the wrong exhaustion rules, but they argue that they exhausted their claims no matter which rules apply. (*See* Doc. 37 at 18–28.)

Federal courts have used inconsistent terminology to explain their reasoning in cases like this one. Sometimes they have referred to the legal rules in question as "exhaustion" doctrines. *See, e.g.*, *Carr v. Saul*, 593 U.S. 83, 88 & n.2 (2021) (distinguishing "issue exhaustion" from "exhaustion of administrative remedies"). In other cases, they have attempted to avoid confusion by distinguishing "exhaustion" from "waiver." *See, e.g., Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1023–24 (9th Cir. 2007) (distinguishing "standing" and "exhaustion" from "waiver"). In still others, they have used the terms "exhaustion" and "waiver" interchangeably. *See, e.g.*, *SSA Terminals v. Carrion*, 821 F.3d 1168, 1174 (9th Cir. 2016) (equating "administrative waiver" and "issue exhaustion" (citation omitted)). To complicate matters further, there are important differences between the relevant rules, but also many

similarities, and it can be difficult to know how they fit together. A plaintiff might "waive" an issue, for example, but that waiver does not necessarily mean that the issue was "forfeited." *Compare, e.g.*, *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 489–90 (9th Cir. 2023) (finding that a plaintiff had waived an issue by not alerting the agency to it during an administrative process), *with, e.g.*, *All. for the Wild Rockies v. Higgins*, 183 F.4th 671, 686–87 (9th Cir. 2026) (finding later on, in the same case, that the issue had not been forfeited).

The best way to avoid confusion is to start with the basics. There are two broad principles in play. The Supreme Court has referred to the first as the "exhaustion of administrative remedies." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006) (quoting *McKart v. United States*, 395 U.S. 185, 193 (1969)). This doctrine "provides that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Id.* (quoting *McKart*, 395 U.S. at 193). People must take all of the steps that an administrative agency offers them, and they must do this "properly," by complying with deadlines, following the agency's procedural rules, and giving the agency a chance to make a final decision on the merits. *Id.* at 90–91 (citation and emphasis omitted); *see also Carr*, 593 U.S. at 88 n.2. A person might not be permitted to file a lawsuit at all if he did not exhaust his administrative remedies beforehand. *See Petrick*, 68 F.4th at 488; *Portland Gen. Elec.*, 501 F.3d at 1023–24. Congress sometimes includes exhaustion rules in federal statutes, but courts have discretion to require the exhaustion of administrative remedies even when Congress has not adopted an express statutory requirement. *See McCarthy v. Madigan*, 503 U.S. 140, 144 (1992), *superseded in part by statute on other grounds as explained in Higgins*, 183 F.4th at 678; *see also, e.g.*, *Sisley v. U.S. Drug Enf't Admin.*, 11 F.4th 1029, 1035–36 (9th Cir. 2021) (imposing a judicially created, discretionary exhaustion rule).

The second broad principle is "issue exhaustion," also known as "administrative waiver." *See Carr*, 593 U.S. at 88; *Higgins*, 183 F.4th at 678; *Petrick*, 68 F.4th at 488–89. Where the first principle is concerned with steps in a process, the second focuses on specific issues or questions. In general, it places an obligation on prospective plaintiffs to give federal administrative agencies "an opportunity to address an issue before seeking judicial review of that question." *Carr*, 593

U.S. at 88. Like the doctrine requiring the exhaustion of administrative remedies, the doctrine requiring exhaustion of issues is typically a matter of statutory law and regulations, but again, courts have imposed a judge-made issue rule as well. *Id.* (citing *Sims v. Apfel*, 530 U.S. 103, 108–09 (2000)).

These two doctrines are independent; that is, a plaintiff can exhaust his administrative remedies and yet waive a specific issue. *See, e.g.*, *Petrick*, 68 F.4th at 488–89; *see also, e.g.*, *Sims*, 530 U.S. at 107–08 (distinguishing these doctrines); *Carr*, 593 U.S. at 88 n.2 (same). But if a plaintiff has not exhausted his administrative remedies, then that failure may foreclose judicial review entirely, regardless of the plaintiff's efforts to raise a particular issue at some earlier point. *See Higgins*, 183 F.4th at 678; *Portland Gen. Elec.*, 501 F.3d at 1023–24.

Setting aside the potentially confusing terminology, it is often a relatively simple matter to confirm which of these two broad principles is actually in dispute. In *Carr v. Saul*, for example, the petitioners were seeking disability benefits from the Social Security Administration. 593 U.S. at 86. They had applied unsuccessfully for benefits with the agency, then sought reconsideration before the agency, then participated in hearings before an administrative law judge, and, finally, requested a review by the agency's internal appeals council, all before they filed a challenge in federal court. *See id.* at 86–87. Because they had taken each of these required steps, it was clear that they had exhausted their administrative remedies. *See id.* at 86, 88 n.2. The real debate was whether they were required to bring a specific issue to the agency's attention before they presented it to a federal court, and thus whether they had waived that particular issue. *See id.* at 88. In the *Petrick* and *Higgins* cases cited above, the Circuit had no doubt that the real debate was about whether the plaintiffs had exhausted or waived a particular issue—not whether the plaintiffs had exhausted their administrative remedies. This was so clear, in fact, that the panel was willing to overlook the agency's use of the incorrect terminology in its argument before the district court. *See Petrick*, 68 F.4th at 488.

This case is not as simple. The reason has to do with Caltrans's status as a state agency. Disputes about federal administrative rules usually involve federal claims against federal agencies, so in deciding whether a plaintiff has exhausted all of the available administrative

remedies, there is only the federal law, the federal regulation, and the federal record to consult. Caltrans, by contrast, is subject to both federal law (NEPA) under its memorandum of understanding with the federal government and state law (CEQA) by virtue of its status as a state agency. And as Caltrans correctly points out, the plaintiffs did not rely on federal law and NEPA when they raised concerns about the interchange project. They instead cited CEQA and other state laws—repeatedly, in fact. (*See* Doc. 30-3 at 67.) From Caltrans's vantage point, "claims brought under CEQA cannot be considered the same claims as those brought under NEPA because each statute has different standards, analysis and requirements." (Doc. 41 at 3; *see also* Doc. 30-2 at 18–19.) The plaintiffs do not contend otherwise. They contend only that those differences are "inapposite." (Doc. 37 at 21 n.7.) One could argue, then, as Caltrans does, that the plaintiffs did not present or exhaust any NEPA claim whatsoever, but rather presented a state law CEQA claim only, thus exhausting no federal *remedies* under the first broad principle discussed above.

At the top line, Caltrans is right to point out that a plaintiff cannot file an APA lawsuit about an alleged NEPA violation without first participating in the agency's review process. Caltrans is also correct to argue that federal courts have enforced this requirement as a matter of exhausting administrative remedies. *See, e.g.*, *Higgins*, 183 F.4th at 678 (reiterating in a NEPA case that the "[f]ailure to exhaust administrative remedies when required may foreclose judicial review"); *see also, e.g., Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 571 (9th Cir. 2016) (citing 5 U.S.C. § 704 and *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 965 (9th Cir. 2006)). The reasons for this requirement are well known in the Supreme Court's jurisprudence. It recognizes Congress's decision to delegate authority to an agency with relevant expertise. *See Woodford*, 548 U.S. at 89; *McCarthy*, 503 U.S. at 145. It also "acknowledges the commonsense notion of dispute resolution that an agency ought to have an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." *McCarthy*, 503 U.S. at 145. It filters out the weakest and strongest cases, and it helps to produce a useful record for the cases in the middle. *See Woodford*, 548 U.S. at 89.

While Caltrans is on solid ground citing cases about exhausting administrative remedies,

and although its brief accurately characterizes the plaintiffs' pre-litigation letter as focused on state law, the record does not support the conclusion that Caltrans builds on top of these premises. The record shows instead that the plaintiffs properly participated in the administrative process and thus fulfilled the purposes of the doctrine of exhaustion of administrative remedies. As summarized in the background section above, they sent Caltrans detailed written comments about the project, and they did it at an appropriate point in the process. Caltrans had enough time to consider their letter, hear their concerns, apply its expertise, and to respond. Now that the plaintiffs have filed this federal case, there is a record of Caltrans's decision and its reasons. On the bottom line then, there is no doubt that the plaintiffs exhausted their administrative remedies as a practical matter.

Caltrans relies on two arguments to press the opposite conclusion. The first can be rejected without difficulty. Caltrans cites regulations providing that comments "on an environmental impact statement or on a proposed action shall be a specific as possible." (Doc. 30-2 at 13 (quoting 40 C.F.R. § 1503.3(a) (2020).) This regulation is relevant for deciding whether the plaintiffs raised a particular issue (and thus whether they exhausted that issue or waived it), but not whether they pursued relief from the agency (and thus whether they exhausted their administrative remedies). It does not show that the plaintiffs failed to exhaust their administrative remedies.

Caltrans next argues "that raising CEQA issues does not also serve as raising NEPA issues for the purpose of exhausting administrative remedies" because the two laws "are not interchangeable." (Doc. 30-2 at 18.) That may be true in some cases, but not in this one. A few details about the similarities and differences between CEQA and NEPA are necessary to explain why.

California passed CEQA only a few months after NEPA became federal law. *Friends of Mammoth v. Bd. of Supervisors*, 8 Cal. 3d 247, 260 (1972), *disapproved of in part on other grounds by Kowis v. Howard*, 3 Cal. 4th 888 (1992). The "timing and the titles of the two acts tend to indicate that [CEQA] was patterned on the federal act," and in many respects, CEQA is "'much like the Federal NEPA.'" *Id.* at 260–61 (quoting Powell, *The Courts as Protectors of the*

*Environment*, 47 L.A. Bar Bull. 215, 218 (1972)) (other citations and footnotes omitted). "Indeed, much of the phraseology of [CEQA] is either adopted verbatim from or is clearly patterned upon the federal act." *Id.* at 260.

In substance, the two laws also share a similar "key provision," i.e., the basic requirement to prepare a document about the environmental impacts of the proposed action. *Id.* There is even a state-law parallel of the federal EIS: the "EIR," i.e., the "environmental impact report." *See id.* The federal EA and FONSI procedures also have rough parallels in the CEQA's own "initial study" and "negative declaration" procedures, respectively. *See, e.g.*, Cal. Code Regs., tit. 14, §§ 15063, 15064; 15070; *see also Sierra Club v. County of Sonoma*, 6 Cal. App. 4th 1307, 1317–18 (1992).

NEPA and CEQA are so similar, in fact, that it can be sensible (and legally permissible) for California agencies to prepare a single, consolidated document to fulfill their obligations under both statutes. *See* Cal. Pub. Res. Code § 21083.5(a). That is what Caltrans did in this case. Its state-law EIR also serves as its federal-law EA. (*See* Doc. 80 ¶ 133.) With respect to the federal law, Caltrans found "no significant impacts" and decided to publish a notice to that effect, as noted above. (EA at 8.) With respect to the state law, Caltrans decided there *were* significant "impacts associated with Climate Change, which would indirectly and/or directly affect human beings within the project limits," but it found that these impacts were nevertheless "unmitigable." (*Id.*) It relied on the same report to support both conclusions. Its responses to the plaintiffs' letter were similarly unified.

Some caution is certainly warranted. Broad comparisons between CEQA and NEPA risk trivializing "the scope, breath or complexity" of the relevant state statutes and regulations. *Robinson v. Salazar*, 838 F. Supp. 2d 1006, 1038 n.15 (E.D. Cal. 2012). "The text of CEQA itself now runs to roughly one hundred pages, with almost two hundred pages of explanatory and implementing 'guidelines.'" *Id.* State environmental litigation under CEQA has become so complex, in fact, that larger counties like Fresno County must designate judges to hear CEQA cases and develop an expertise in environmental and land use laws. *Id.* (citing Cal. Pub. Res. Code § 21167.1(b)) (other citations and quotation marks omitted).

Courts and commentators have also emphasized that "CEQA and NEPA are different statutes with different requirements." *Ctr. for Cmty. Action & Env't Just. v. Fed. Aviation Admin.*, 61 F.4th 633, 647 (9th Cir. 2023) (quoting *Save Strawberry Canyon v. U.S. Dep't of Energy*, 830 F. Supp. 2d 737, 749 (N.D. Cal. 2011)); *see also, e.g.*, Ronald B. Robie et al., Cal. Civ. Prac. Envt. Litig. § 8:3 (2025) (summarizing differences). Setting aside the relatively superficial differences in "nomenclature" highlighted above, *see* Robie et al., *supra*, § 8:3, a state agency's obligations under CEQA may exceed its obligations under NEPA in a substantive sense, *Ctr. for Cmty. Action*, 61 F.4th at 647 (citing *City of S. Pasadena v. Goldschmidt*, 637 F.2d 677, 680 n.4 (9th Cir. 1981)). For example, CEQA "contains a substantive mandate that public agencies refrain from approving projects for which there are feasible alternatives or mitigation measures,'" unlike NEPA, which is a procedural statute. *Regents of Univ. of Cal. v. Fed. Emergency Mgmt. Agency*, No. 17-03461, 2019 WL 7037942, at *5 (N.D. Cal. Dec. 20, 2019), *aff'd*, 847 F. App'x 416 (9th Cir. 2021) (quoting *Friends of the Santa Clara River v. U.S. Army Corps of Engineers*, 887 F.3d 906, 914 n.5 (2018)). "CEQA thus places a higher priority on environmental values than NEPA." Robie et al., *supra* § 8:3.

Caltrans argues that because CEQA is distinct from NEPA, broader than NEPA, and more stringent than NEPA, a comment about CEQA does not necessarily put an agency on notice of a potential NEPA problem. (*See* Doc. 30-2 at 19.) As Caltrans puts it, "[t]he same analysis could violate CEQA's more robust and detailed requirements but comply with NEPA." (*See* Doc. 41 at 4–5.) This may be true. In simplified terms, if both NEPA and CEQA impose obligation A, but only CEQA imposes obligation B, then a comment that mentions only state law and that focuses exclusively on obligation B might fall short of alerting the agency to a potential NEPA claim. That type of comment may accordingly fall short of exhausting the federal administrative remedy, even if the state remedy was exhausted.

Caltrans identifies a few CEQA-specific requirements that might qualify as a state-specific "obligation B," so to speak. It notes, for example, that under CEQA, an "EIR must be prepared if the action may have a significant effect on *any* environmental resource." (Doc. 30-2 at 19 (emphasis in original) (citing Cal. Code Regs. tit. 14, § 15063(b)).) "[E]ach and every

significant effect on the environment be disclosed in the EIR and mitigated, if feasible." (*Id.* (citing Cal. Code Regs. tit. 14, §§ 15126.2, 15126.4).) Caltrans also contends that "NEPA and CEQA require different analyses of environmental setting and baseline." (Doc. 41 at 6.) "Under NEPA," it argues, "the 'no-action' alternative, which represents conditions that would result if the agency continued existing policy or did not implement the proposed action, serves as a baseline against which the effects of implementing the proposed action and other alternatives are measured." (*Id.*) "Under CEQA," by contrast, Caltrans argues that the baseline is "the date when environmental analysis began or notice of preparation is filed." (*Id.*) Finally, Caltrans argues that CEQA, unlike NEPA, requires the consideration of greenhouse gas emissions. (*See id.*)

If the plaintiffs had submitted a letter focused solely on CEQA—if they had argued, for example, that the project would increase greenhouse gas emissions and that Caltrans was required to mitigate the effects of that increase, and nothing more—then Caltrans would be on firmer footing in arguing that the plaintiffs had not exhausted their administrative remedies under the APA and NEPA. But the plaintiffs did not rely solely on state-specific requirements. As summarized in the background section above, the plaintiffs argued that higher-capacity interchanges would channel ever more polluting truck traffic through their neighborhoods and would spur ever more polluting industrial development nearby. They protested that Caltrans had not reckoned with the fact that many people lived, worked, studied, and worshipped near the interchanges. Caltrans does not and could not persuasively contend that these issues are unrelated to its obligations under federal law.

To reiterate, then, the plaintiffs have exhausted their administrative remedies by pursuing relief from Caltrans during the environmental review. This leaves the second exhaustion doctrine summarized above, i.e., issue exhaustion. Did the plaintiffs exhaust the issues they included in their judicial complaint?

There are, again, a few preliminary points to clarify. As noted, issue exhaustion is typically required by statute or regulation, but it can also be a judge-made rule. In some cases, for example, courts have required issue exhaustion "based on 'an analogy to the rule that appellate courts will not consider arguments not raised before trial courts.'" *Carr*, 593 U.S. at 88 (quoting

*Sims*, 530 U.S. at 108–09). Caltrans does not argue that this Court should enforce this judge-made exhaustion rule. It would not be a good fit for this case in any event. Caltrans was not overseeing the type of adversarial or adjudicative process that might permit a persuasive analogy to trial-court litigation on appeal. *Carr*, 593 U.S. at 88 (quoting *Sims*, 530 U.S. at 10108–09); *see also Higgins*, 183 F.4th at 684 (discussing and applying this rule).

Caltrans relies instead on a combination of NEPA-specific federal regulations and judicial decisions. At the time Caltrans was conducting its review, federal NEPA regulations required "that comments be as specific as possible," as noted above. *See* Council on Environmental Quality, *Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act*, 85 FR 43304-01, 43318 (July 16, 2020) (citing 40 C.F.R. § 1503.3 (2020)). Regulators did not elaborate on what they meant by "as specific as possible," but they did make clear that they intended to reinforce "the principle that parties may not raise claims based on issues they themselves did not raise during the public comment period," *id.* at 43317–18, citing the Supreme Court's decision in *Public Citizen*, *see id.* (citing 541 U.S. at 764–65). Caltrans relies on the same line of Supreme Court and federal appellate decisions to explain its own argument now. (*See* Doc. 30-2 at 14). It does not argue that the regulations impose a stricter exhaustion requirement than the Supreme Court or the Ninth Circuit has imposed. Its motion is therefore best understood as advancing a combined argument based on both the regulations and the case law.

Under that case law, people who challenge "an agency's compliance with NEPA must 'structure their participation so that it alerts the agency to the parties' position and contentions,' in order to allow the agency to give the issue meaningful consideration." *Pub. Citizen*, 541 U.S. at 764 (alterations omitted) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978)). This means in more practical terms that the "failure to raise arguments before an agency, such as in comments during a public-comment process, usually waives a litigant's rights to make those arguments in court." *Petrick*, 68 F.4th at 487–88. But federal district courts do not close their doors to plaintiffs just because their objections to the agency were imprecise or omitted specific "magic words." *Barnes v. U.S. Dep't of Transp.*, 655

F.3d 1124, 1133 (9th Cir. 2011) (quoting *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 966 (9th Cir. 2002)). An imprecise objection is enough if it gave the agency a chance to address or correct the alleged problem. *See Protect Our Communities Found. v. LaCounte*, 939 F.3d at 1036 (citing *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 899 (9th Cir. 2002)).

Courts also reject issue-waiver arguments if the agency had an opportunity to consider the issue despite the challenger's failure to raise it, for example because another person brought it to the agency's attention or because the agency itself had already recognized it. *See id.* The agency is the one who "bears the primary responsibility to ensure that it complies with NEPA, and an EA's or an EIS' flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." *Pub. Citizen*, 541 U.S. at 765 (citing *Vt. Yankee*, 435 U.S. at 553). If the agency had "independent knowledge of the issues," then it cannot fault the plaintiffs failing to raise it. *Barnes*, 655 F.3d at 1132 (quoting *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1092 (9th Cir. 2006)).

The Ninth Circuit has said "repeatedly" that these issue-waiver rules "should be interpreted broadly" in favor of the plaintiffs against whom they are asserted. *Nat'l Parks & Cons. Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1065 (9th Cir. 2010). In the Supreme Court and the Ninth Circuit alike, the rule has tended to block only clear-cut omissions, abrupt about-faces, and bad-faith obstructionism.

The Supreme Court's 1978 opinion in *Vermont Yankee* is a good example of this trend. A power company had applied for federal permits to build two new nuclear power plants. *See* 435 U.S. at 530–31. A local environmental organization objected. *See id.* at 532. Some of its objections were based on the idea that it would be better to conserve power than to build more power plants. *See id.* at 532, 536–37. The agency held further hearings, but the environmental organization did not attend or participate in them, and it said that it had no relevant evidence or citations to offer. *See id.* at 532. After the hearings, the agency found that the demand for more power was attributable to "normal industrial and residential use," and it declined to investigate "whether the customary uses being made of electricity in our society are proper or improper," so it issued a final EIS and granted the requested permits. *Id.* at 532–33.

In the lawsuit that followed, the lower court held that the EIS was defective. In its view, the agency should have investigated energy conservation more thoroughly as an alternative to new construction. *See id.* at 550 (citing 547 F.2d 622, 627–78 (D.C. Cir. 1976)). The Supreme Court disagreed in a unanimous opinion. *See id.* at 552–53. Its reasoning began with the idea that "alternative" is a not a "self-defining" word when it comes to NEPA reviews. *See id.* at 551. The Court also emphasized that "energy conservation" was a relatively novel concept as an "alternative" to increased production at the time. *See id.* at 551–52. In the late 1960s and early 1970s (when the agency was making its decision), the 1973 oil crisis had not occurred. *See id.* at 552. President Carter had not given his "sweater speech" on national TV. *See id.* So general references to energy conservation were simply not enough. *See id.* at 553. Which uses were inefficient or wasteful? Where could power demand be reduced? How could this be accomplished? The challengers had not raised these issues or cited any relevant evidence before the agency. If anything, their objections were gamesmanship. They had made "cryptic and obscure references to matters that ought to be considered," and then when the agency had when asked them to explain and clarify their position, they had "virtually declined to participate," only to turn around and file a lawsuit. *Id.* at 554.

It was in this context that the Court wrote the sentence that is now quoted so commonly in cases about the issue-waiver rule: "while it is true that NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action, it is still incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions." *Id.* at 553. A person cannot be said to have "structured" his participation in a "meaningful" way if he has raised some issue vaguely, then declined to explain or offer evidence in response to the agency's invitation. "This is especially true when the [objectors] are requesting the agency to embark upon an exploration of unchartered territory, as was the question of energy conservation in the late 1960's and early 1970's." *Id.*

The Supreme Court's unanimous decision to enforce this same waiver rule in *Public Citizen* was simpler, but it underscores that a waiver must be rather clear-cut if it is to defeat a

plaintiff's claim. In 2001, an international arbitration panel determined that the United States had violated its treaty obligation to accept applications from Mexican motor carriers who wanted to operate inside the United States. 541 U.S. at 760. In response, the Federal Motor Carrier Safety Administration created new application forms and proposed a new set of safety regulations for Mexican motor carriers. *See id.* at 760–61. It issued and EA and found that the environmental effects of these new regulations would be "minor," so it published a FONSI; no in-depth EIS would be prepared. *See id.* at 762. A group of consumer advocacy and labor organizations challenged this decision, arguing among other things that the agency should have considered whether "more restrictive safety standards" would have reduced pollution. Resp. Br. at 40, Case No. 03-358 (Mar. 12, 2004); *see also* 541 U.S. at 764. The problem was that none of the organizations had brought the possibility of more restrictive regulations to the agency's attention, and they had proposed no such regulation. *See* 541 U.S. at 764–65. In any event, no evidence showed that more restrictive regulations would actually reduce pollution, let alone that the agency had authority to adopt more restrictive regulations. *See id.*

Recent appellate decisions are in the same vein. The Ninth Circuit's opinion in *Petrick* is a representative example. *See generally* 68 F.4th 475. In that case, the U.S. Forest Service had given notice of a project to cut down trees and conduct prescribed burns in a national forest. *See id.* at 484. It stated its belief that the project would be exempt from NEPA because it was within the "wildland-urban interface" under the terms of the Healthy Forests Restoration Act. *See id.* Public comments were extensive. They spanned more than a hundred pages. *See id.* at 484, 489. But the Forest Service maintained its position in the end. *Id.* A conservation organization then filed a federal lawsuit and obtained summary judgment based on its argument that the project did not fall within the wildland-urban interface, and thus that it was not exempt from NEPA. *See id.*

The Ninth Circuit reversed the summary judgment order on appeal. The reason was simple: in none of the submitted comments had someone claimed to the agency that the project was outside the wildland-urban interface. *See id.* at 489. The plaintiff organization had argued only that the term itself was defined vaguely and could be set by "entities other than the general public." *See id.* It had argued, in other words, that the wildland-urban interface was too large and

the Healthy Forests Restoration Act was ill-conceived. *Id.* Its comments to the agency thus implied that the project was *inside* wildland-urban interface—but should not have been—in clear contrast to the challenger's argument in court, i.e., that the project was *outside* the wildland-urban interface. *See id.*

Caltrans argues that the plaintiffs in this case have made a similar change of course. (*See, e.g.* Doc. 41 at 3.). They have not. The plaintiffs have not voiced starkly different or conflicting concerns about the construction project's environmental effects as time has gone on, as the objectors did in *Public Citizen* or *Petrick*. Now, as before, the plaintiffs argue that Caltrans was wrong to dismiss their concerns about nearby neighborhoods, schools, and places of worship; that it should have thought more carefully about the possibility that newer, higher-capacity freeway interchanges will lead to more polluting truck traffic and industrial development; and that it should have thought more carefully about whether higher capacity freeway interchanges would reinforce longstanding structural injustices. The plaintiffs' opposition brief demonstrates point by point that their current allegations parallel the arguments they advanced during the administrative process. (*See* Doc. 37 at 21–23). Caltrans cannot dispute that it was aware of those concerns. It responded to them in detail, point-by-point, in writing, as summarized in the background section above.

Caltrans implies as well that this lawsuit is part of a broader campaign of obstructionism, as in *Vermont Yankee*, citing the "generous opportunities" and "significant States resources" that it has devoted to reports, public comments, hearings, responses, and meetings. (*See id.* at 3–4.) It describes this lawsuit as a "bait and switch" and argues the plaintiffs' strategy is "unfair." (*Id.* at 4.) But Caltrans cites no portions of the administrative record to show the plaintiffs refused invitations to submit evidence or explain their position, nor that they made vague, generic, and "cryptic" objections, as the plaintiffs had in *Vermont Yankee*. To the contrary—and as Caltrans correctly puts it—the plaintiffs' letter was "refined" and "precise." (*See* Doc. at 3.)

More fundamentally, some of the plaintiffs' claims are not subject to the *Vermont Yankee* waiver rule at all. There is no "categorical rule that all objections not raised to the agency are forfeited." *See Higgins*, 183 F.4th at 686. In some cases, such as *Vermont Yankee* and *Public*

*Citizen*, "NEPA plaintiffs [have] submitted comments that did not alert the agency of their concerns." *Id.* (quoting *'Ilio'ulaokalani Coal.*, 464 F.3d at 1092). In that type of case, the plaintiffs must exhaust the issue by raising their concerns. *See id.* at 686–87. The agency might otherwise never become aware of the issue or the underlying concerns. But in other cases, the plaintiffs' concern is instead that the agency has run afoul of a particular statutory or procedural rule that it must always follow, regardless of what objections might arise. *See id.* at 686. There is no issue-exhaustion requirement in this second category of cases. *See id.* at 686–87. Some of the plaintiffs' claims in this case fit that category. They allege, for example, that Caltrans did not produce copies of studies, did not offer adequate Spanish-language translations, issued a conclusory FONSI, responded to comments inadequately, and did not consider public comments on its FONSI. (*See* Doc. 80 ¶¶ 183, 190–94.) These allegations are unlike those that have triggered an issue-exhaustion requirement under *Vermont Yankee* and *Public Citizen*. *See Higgins*, 183 F.4th at 686–87 (collecting authority).

In sum, the Court denies the motion to dismiss insofar as it is based on Caltrans's argument that the plaintiffs did not exhaust their administrative remedies and waived the issues that they have now raised in a judicial complaint.

**MERITS OF THE NEPA CLAIM**

Caltrans also moves to dismiss a portion of the plaintiffs' NEPA claim on its merits. It focuses on the plaintiffs' allegations about whether the agency permitted the public to participate in the environmental review process. (*See* Doc. 30-2 at 20–23 (citing Doc. 80 ¶¶ 190–91).)

The plaintiffs do not disagree that some of their allegations are duplicative (*see* Doc. 80 ¶ 190), that Caltrans was not obligated to provide additional technical information or Spanish translations (*see id.* ¶¶ 191–92), or that Caltrans responded adequately to public comments (*id.* ¶ 193; *see also* Doc. 30-2 at 21–23.) "In this district, as in others, the failure to respond to an argument is a waiver of any opposition to that argument." *Chang v. County of Siskiyou*, No. 22-01378, 2024 WL 4581687, at *11 (E.D. Cal. Oct. 25, 2024) (collecting authority). "This rule commonly leads to not only to the rejection of the omitted arguments, but even the outright dismissal of any claims that go unmentioned in an opposition brief." *Id.* (collecting authority).

The motion to dismiss is granted in part to this extent, with leave to amend. (*See* Doc. 37 at 30 (requesting leave to amend to add factual allegations if necessary).)

By contrast, the plaintiffs do oppose the motion insofar as it targets their allegation that Caltrans had an obligation to "allow for a public review of the FONSI" itself. (*See* Doc. 37 at 28–30.) They cite their allegation that a public review was necessary because "the Project is closely similar to one that ordinarily requires an EIS." (Doc. 80 ¶ 194 (citing 40 C.F.R. § 1501.6(b)(2)(i) (2020).) Caltrans contends first that this allegation is conclusory, a mere "recitation" of the statute's or regulation's language. (*See* Doc. 30-2 at 23.) That is true, but as the plaintiffs argue in opposition, the complaint includes the necessary supporting allegations in its previous sections. (*See, e.g.*, Doc. 80 ¶¶ 82, 90–92.) Caltrans next argues that the plaintiffs' allegations are "based on the premise that the EA is inadequate or an EIS should have been prepared," and it reiterates its position that the plaintiffs waived this argument. (Doc. 30-2 at 23.) The Court rejects this argument for the reasons above. The plaintiffs did not waive this issue.

**CONCLUSION**

The motion to dismiss (Doc. 30) is **GRANTED IN PART** with leave to amend. Any third amended complaint must be filed within thirty days.

IT IS SO ORDERED.

Dated: November 17, 2026

UNITED STATES DISTRICT JUDGE